WILLIAM N. CARLON (State Bar No. 305739)
Law Office of William Carlon
437 Post Street
Napa, CA 94559
Tel: (530) 514-4115
Email: william@carlonlaw.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>Plaintiff,<br>vs.<br><br>BFI WASTE SYSTEMS OF NORTH AMERICA, LLC and REPUBLIC SERVICES, INC.,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387)** |

California Sportfishing Protection Alliance ("CSPA" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.     JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 ("Clean Water Act," "CWA," or "Act") against BFI Waste Systems of North America, LLC and Republic Services, Inc. ("Defendants"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation). The relief requested is authorized pursuant to 33 U.S.C. § 1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202

(power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.    On May 13, 2025, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("CWA Notice Letter"), and of its intention to file suit against Defendants, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991).  Plaintiff mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"), the Executive Director of the San Francisco Bay Regional Water Quality Control Board ("Regional Board"); and the U.S. Attorney General of the U.S. Department of Justice, pursuant to 40 C.F.R. § 135.2(a)(1) (1991). A true and correct copy of CSPA's CWA Notice Letter is attached hereto as **Exhibit 1**, and is incorporated by reference.

3.    More than sixty days have passed since Plaintiff served this CWA Notice Letter on Defendants and the agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.    Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), and Civil Local Rule 3-2(d) because the source of the violations is located within this District. Intra-district venue is proper in San Francisco or Oakland, California, because the source of the violations is located within Alameda County, California.

## II.    <u>INTRODUCTION</u>

5.    This Complaint seeks relief for Defendants' violations of the CWA at a facility owned and/or operated by Defendants.  Defendants' facility is located at 42600 Boyce Road in Fremont, California 94538 ("Facility").

6.    Defendants discharge pollutant-contaminated storm water from the Facility into

municipal storm drains that discharge to the Pacific Ocean via the Lower San Francisco Bay (collectively, the Pacific Ocean and the Lower San Francisco Bay are referred to as the "Receiving Waters").

7.     The Receiving Waters are waters of the United States.

8.     Defendants are violating both the substantive and procedural requirements of the CWA.

9.     Defendants' discharges of pollutant-contaminated storm water from the Facility violate the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 14-57-DWQ as amended by Order 2015-0122-DWQ & Order 2018-0028-DWQ ("General Permit" or "Permit").

10.    Defendants' violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

11.    The failure on the part of industrial facility operators such as Defendants to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as the Receiving Waters. With every significant rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for

Complaint For Declaratory and                          3                          Case No.
Injunctive Relief and Civil Penalties

people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

12.    Heavy metals, including copper, zinc, and lead that accumulate in lakes, oceans, rivers and streams threaten the environment and can instigate health problems and genetic changes in aquatic life, birds and other animals dependent on these waterbodies. These metals in water cannot be easily metabolized by aquatic organisms and can become enriched in organs such as the liver and kidney. Studies show that heavy metals can enter aquatic animals through their gills or during feeding and bind with substances in the bodies of wildlife. High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces. Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic, and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

13.    San Francisco Bay contains ecologically sensitive areas, and is essential habitat for dozens of cetacean, pinniped, fish, bird, macro-invertebrate and invertebrate species.

14.    San Francisco Bay also provides numerous recreational activities, including swimming, surfing, SCUBA diving, and kayaking.

15.    San Francisco Bay provides non-contact recreation and aesthetic opportunities, such as hiking, running, biking, and wildlife observation.

16.    Industrial facilities, like Defendants', that discharge storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife, expose people to toxins, and harm the special social and economic benefits San Francisco Bay has for locals and visitors alike.

17.    Controlling polluted storm water discharges associated with industrial activity is essential to protecting California's surface and coastal waters and essential to CSPA's mission.

III.    **PARTIES**

18.    CSPA is a 501(c)(3) non-profit public benefit corporation organized under the laws of California. CSPA's primary address and office is located at 1608 Francisco St., Berkeley, California.

19.    CSPA's members live and/or recreate in and around San Francisco Bay. CSPA is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, CSPA actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

20.    CSPA members work, own homes and live in Alameda County and use and enjoy the waters near the Facility, including the Receiving Waters, nearby waterfronts, bordering parks, pathways, and athletic fields, for fishing, biking, sailing, boating, kayaking, viewing wildlife, walking, running, and engaging in scientific study, including habitat monitoring and restoration activities.

21.    Discharges of polluted storm water from the Facility degrade water quality and harm aquatic life in the Receiving Waters and impair CSPA's and its members' use and enjoyment of those waters.

22.    The violations of the General Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendants' discharge of polluted storm water from the Facility. Thus, the interests of CSPA's members have been, are being, and will

Complaint For Declaratory and                    5                          Case No.
Injunctive Relief and Civil Penalties

continue to be adversely affected by Defendants' failure to comply with the General Permit and the Clean Water Act.

23.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

24.    The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

25.    Defendant BFI Waste Systems of North America, LLC is a limited liability company organized under the laws of Delaware, and registered with the State of California to conduct business in California.

26.    CSPA is informed and believes, and thereon alleges, that Defendant BFI Waste Systems of North America, LLC is an owner and operator of the Facility.

27.    Defendant Republic Services, Inc. is a corporation organized under the laws of Delaware and registered with the State of California to conduct business in California.

28.    CSPA is informed and believes, and thereon alleges, that Defendant Republic Services, Inc. is an owner and operator of the Facility.

29.    Defendants are "persons" pursuant to the Act.  33 U.S.C. § 1362(5).

## IV.    LEGAL BACKGROUND

### A.    Clean Water Act

30.    Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ."  33 U.S.C. § 1251(a)(2).  To these ends, Congress developed both a water quality-based and technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

31.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a)

prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

32.    The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6).

33.    A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

34.    "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7). Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters. 40 C.F.R. § 230.3 (2015).

35.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity. *Id.* § 1342(p)(2)(B).

36.    Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

37.    An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $68,445 per day for violations occurring after November 2, 2015, where penalties are assessed on or after January 8, 2025, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40

C.F.R. §§ 19.1–19.4.

**B.    California's General Industrial General Permit**

38.    Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

39.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

40.    The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

41.    Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

42.    Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit.  A violation of the General Permit is a violation of the Act. *See* General Permit, Section XXI.A.

43.    In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

44.    The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

Complaint For Declaratory and                    8                    Case No.
Injunctive Relief and Civil Penalties

45.     Discharge Prohibition III.B of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code.  Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.  Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

46.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

47.     The 2008, 2015, and 2021 versions of U.S. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities include numeric standards called benchmarks, which are pollutant concentration values for industrial storm water discharges ("U.S. EPA Benchmarks").  *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, effective September 29, 2008, effective June 4, 2015, and effective September 29, 2021.

48.     U.S. EPA Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a permittee facility achieve the statutory BAT/BCT standards.  *See* 80 Fed. Reg. 34403, 34405 (June 16, 2015); *see also* 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746, 64766-67 (Oct. 30, 2000).

49.     The discharge of storm water containing pollutant concentrations exceeding U.S. EPA Benchmarks evidence a failure to develop and implement pollution control strategies that achieve BAT/BCT-level pollutant reductions. *See Santa Monica Baykeeper v. Kramer Metals, Inc. ("Kramer")*, 619 F. Supp. 2nd 914, 921-25 (C.D. Cal. 2009); *see also* 80 Fed. Reg. 34403,

34405 (June 16, 2015).

50.     The following benchmarks have been established, effective September 29, 2021, for pollutants discharged by Defendants: total suspended solids – 100 mg/L; pH – 6.0-9.0 s.u.; zinc – 0.12 mg/L; chemical oxygen demand – 120 mg/L; and, copper – 0.00519 mg/L.

51.     The California Toxics Rule ("CTR") is an applicable water quality standard under the Permit, the violation of which is a violation of Permit conditions. *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*, 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015).

52.     CTR establishes numeric receiving water limits for toxics pollutants in California surface waters. 40 C.F.R. § 131.38. The CTR establishes a numeric limit for at least one of the pollutants discharged by Defendants: zinc – 0.12 mg/L (maximum concentration); and, copper – 0.013 mg/L (maximum concentration).

53.     The Water Quality Control Plan for the San Francisco Bay Region ("Basin Plan") sets forth water quality standards and prohibitions applicable to Defendants' storm water discharges from its Facility. The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. Basin Plan at 3.1.15 through 3.1.17. The Basin Plan also provides that "Controllable [water quality] factors are not allowed to cause further degradation of water quality in instances where uncontrollable factors have already resulted in water quality objectives being exceeded. *Id*. at p 3-2.

54.     The Basin Plan specifies existing beneficial uses for the Lower San Francisco Bay including industrial, commercial fishing, shellfish harvesting, estuarian habitat, fish migration, rare and endangered species, spawning, wildlife habitat, contact and noncontact recreation, and navigation. *Id*. at Table 2.1.

55.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable water quality standards are violations of Receiving Water Limitations and Section VI(A) of the General Permit.

56.     The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the

facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

57.    Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the reporting year for any non-significant revisions.  General Permit, Section X.B.

58.    Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice.  General Permit, Section X.H.2.

59.    Special Conditions Section XX.B of the General Permit require a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of Receiving Water Limitations, Section VI.  The documentation must describe changes the discharger will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit, Section XX.B.

60.    Section XV of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

61.    The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Section IV of the General Permit unless authorized by another NPDES permit.  General Permit, Section III.B.

Complaint For Declaratory and                    11                         Case No.
Injunctive Relief and Civil Penalties

1       62.     The General Permit requires dischargers to implement a Monitoring

2   Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers

3   must identify all storm water discharge locations.  General Permit, Section X.I.2.  Dischargers

4   must then conduct monthly visual observations of each drainage area, as well as visual

5   observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.

6   Dischargers must also collect and analyze storm water samples from two (2) storm events within

7   the first half of each reporting year (July 1 to December 31) and two (2) storm events during the

8   second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section

9   XI.B requires dischargers to sample and analyze during the wet season for basic parameters such

10   as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific

11   parameters, and any other pollutants likely to be in the storm water discharged from the facility

12   base on the pollutant source assessment.  General Permit, Section XI.B.6.

13       63.     Dischargers must submit all sampling and analytical results via SMARTS within

14   thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11.  Sampling

15   results must be compared to the two types of Numeric Action Level ("NAL") values set forth at

16   Table 2 of the General Permit.  General Permit, Section XII.  An annual NAL exceedance occurs

17   when the average of the results for a parameter for all samples taken within a reporting year

18   exceeds the annual NAL value.  General Permit, Section XII.A.1.  An instantaneous NAL

19   exceedance occurs when two (2) or more results from samples taken for any single parameter

20   within a reporting year exceed the instantaneous maximum NAL value.  General Permit, Section

21   XII.A.2.  If a discharger has an NAL exceedance during a reporting year, the discharger's status

22   changes to Level 1 status under the General Permit and the discharger must comply with the

23   requirements set forth for Level 1 status operators set forth at Section XII.C.  The discharger's

24   status shall change to Level 2 status if sampling results indicated an NAL exceedance for a

25   parameter while the discharger is in Level 1 status.  If a discharger becomes Level 2 status it must

26   comply with the obligations set forth at Section XII.D of the General Permit.

27       64.     Dischargers must submit an Annual Report no later than July 15th following each

28   reporting year certifying compliance with the Permit and/or an explanation for any non-

Complaint For Declaratory and        12        Case No.
Injunctive Relief and Civil Penalties

1    compliance.  General Permit, Section XVI.

2        65.    When the 2015 Permit became effective on July 1, 2015, all permittees were in

3    "Baseline status." See 2015 Permit, Section XII(B). A permittee's Baseline status for any given

4    parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same

5    parameter. See General Permit, Section XII(C).

6        66.    Level 1 status commences on July 1 following the reporting year during which the

7    exceedance(s) occurred. See General Permit, Section XII(C). By October 1 following

8    commencement of Level 1 status, permittees are required to: complete an evaluation, with the

9    assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant

10   sources at the facility that are or may be related to the NAL exceedance(s); and identify in the

11   evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions

12   necessary to prevent future NAL exceedances and to comply with the requirements of General

13   Permit. See General Permit Section XII(C)(1)(a)-(c).

14       67.    Although the evaluation may focus on the drainage areas where the NAL

15   exceedance(s) occurred, all drainage areas shall be evaluated. See General Permit, Section

16   XII(C)(1)(c).

17       68.    Based upon this Level 1 status evaluation, the permittee is required to, as soon as

18   practicable but no later than January 1 following commencement of Level 1 status, revise the

19   SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and

20   submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP

21   that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the

22   SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* General

23   Permit, Section XII(C)(2)(a)(i)-(ii). 83. The permittee in Level 1 status must also certify and submit

24   via SMARTS the QISP's identification number, name, and contact information (telephone number,

25   e-mail address) no later than January 1 following commencement of Level 1 status. *See* General

26   Permit, Section XII(C)(2)(a)(iii).

27       69.    A permittee's Level 1 status for a parameter will return to Baseline status once a

28   Level 1 ERA Report has been completed, all identified additional BMPs have been implemented,

Complaint For Declaratory and              13                    Case No.
Injunctive Relief and Civil Penalties

and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* General Permit, Section XII(C)(2)(b).

70.     A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* General Permit, Section XII(D).

71.     A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *See*, General Permit, Section XII(D).

## V.    STATEMENT OF FACTS

### A.    The Facility

72.     Defendants own and/or operates the Facility, which engages in municipal waste hauling and trucking.

73.     According to the Facility's SWPPP, last updated December 2023, the Facility's operating hours are Monday through Friday from 3:00 a.m. to 10:30 p.m.

74.     Defendants conduct industrial activities both indoors and outdoors at the approximately 5.4-acre Facility. Industrial activities at the Facility include, but are not limited to: commercial vehicle parking; commercial vehicle refueling; commercial vehicle repairing; storage and maintenance of portable waste containers; and operation of equipment in support of these activities.

75.     The Facility operates under Standard Industrial Classification ("SIC") Code 4212 ("Local Trucking Without Storage").

76.     Defendants most recently submitted a Notice of Intent to comply with the General Permit for the Facility on or about February 21, 2015.

77.     The Facility is assigned the Waste Discharge Identification Number 2 01I011668.

78.     Since at least February 21, 2015, the Facility has operated under General Permit coverage.

79.     Defendants collect and discharge storm water associated with industrial activities at the Facility through at least four discharge points. The Facility's December 2023 SWPPP ("2023 SWPPP") suggests that there are five drainage areas at the Facility.  The 2023 SWPPP states that storm water samples representative of DA-1 are collected from MP-1, which is located at drain inlet 2 (DI-2). The 2023 SWPPP indicates that industrial activities in DA-1 include truck traffic, compressed natural gas ("CNG") refueling bays along the northeast and northwest perimeters, overflow truck parking, portable bin storage areas, and bin cutting and painting at the building that also serves as the tire shop. The wash bay area straddles the border between DA-1 and DA-2, and according to the 2023 SWPPP drains to the local sanitary sewer system.

80.     The 2023 SWPPP suggests that storm water samples representative of DA-2 are collected from MP-2, which is located at DI-9. According to the 2023 SWPPP, industrial activities in DA-2 include truck traffic, a diesel fueling station, an overflow truck parking area, the maintenance shop building that is also home to shipping and receiving in the southern portion of the area, covered outdoor storage of miscellaneous metal pieces under an awning, electronic waste storage, and canopy-protected waste oil and industrial fluids management stations. Samples collected from MP-2 also include flows from DA-5, which the 2023 SWPPP suggests is a non-industrial employee parking lot. The CNG Plant that supplies compressed gas to all site CNG fueling bays is located along the southwest fence-line between administration building and maintenance shop. The footprint of the administration building is also included in DA-2 as its roof drains to downspouts that in turn drain into DA-2.

81.     The 2023 SWPPP indicates that storm water samples representative of DA-3 are collected from MP-3, which is located at DI-3. The 2023 SWPPP states that industrial activities in DA-3 include truck traffic, CNG refueling bays along the northwest perimeter, and portable bin storage.

82.     The 2023 SWPPP states that storm water samples representative of DA-4 are collected at MP-4, which is located at DI-10. The 2023 SWPPP states that the only industrial

activity in DA-4 is truck traffic flowing into and out of the facility.

83.    The areas of industrial activities are sources of pollutants at the Facility. In particular, pollutants of concern from these industrial areas and activities at the Facility include total suspended solids ("TSS"), oil and grease ("O&G"), chemicals affecting the chemical oxygen demand ("COD") of storm water discharges, zinc ("Zn"), and copper ("Cu"). Sources of these pollutants include the industrial activities discussed above, tracking of soils, dust, debris, and waste from other areas and offsite from trucks, leaks from trucks, trailers, equipment, and other vehicles. These pollutants are entrained in storm water runoff and can be tracked offsite by vehicles and other equipment. The industrial activities and areas of industrial activity discussed herein generate and release these pollutants from the Facility, and the Facility discharges them via storm water discharges to municipal storm drains that discharge to the Lower San Francisco Bay, and ultimately to the Pacific Ocean.

84.    The Lower San Francisco Bay is a water of the United States.

85.    The Pacific Ocean is a water of the United States.

**B.    The Facility's Storm Water Discharges**

86.    Defendants discharge storm water containing pollutants, including zinc, chemical oxygen demand, copper, oil and grease, and solids from the Facility during every significant rain event.

87.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, and MP-4 on February 13, 2025 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

88.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on February 13, 2025 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

89.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on December 24, 2024 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

90.    The storm water samples collected by Defendants at the Facility's sampling points

MP-1, MP-2, MP-3, and MP-4 on December 12, 2024 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

91.     The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on January 24, 2024 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

92.     The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on January 10, 2024 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

93.     The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on December 29, 2023 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

94.     The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on December 6, 2023 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

95.     The storm water samples collected by Defendants at the Facility's sampling points MP-1 and MP-3 on February 24, 2023 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

96.     The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on February 3, 2023 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

97.     The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on November 8, 2022 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

98.     The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on November 1, 2022 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

99.     The storm water sample collected by Defendants at the Facility's sampling point MP-1 on February 25, 2025 contained chemicals influencing chemical oxygen demand in

concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

100.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on February 4, 2025 contained chemicals influencing chemical oxygen demand in concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

101.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on December 24, 2024 contained chemicals influencing chemical oxygen demand in concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

102.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, and MP-3 on December 12, 2024 contained chemicals influencing chemical oxygen demand in concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

103.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, and MP-3 on January 10, 2024 contained chemicals influencing chemical oxygen demand in concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

104.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on December 29, 2023 contained chemicals influencing chemical oxygen demand in concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

105.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on December 26, 2023 contained chemicals influencing chemical oxygen demand in concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

106.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on February 3, 2023 contained chemicals influencing chemical oxygen demand in concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

107.    The storm water sample collected by Defendants at the Facility's sampling point

MP-3 on November 8, 2022 contained chemicals influencing chemical oxygen demand in concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

108.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on November 1, 2022 contained chemicals influencing chemical oxygen demand in concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

109.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, and MP-4 on February 13, 2025 contained copper in concentrations in excess of the U.S. EPA Benchmark for copper.

110.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on February 4, 2025 contained copper in concentrations in excess of the U.S. EPA Benchmark for copper.

111.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on December 24, 2024 contained copper in concentrations in excess of the U.S. EPA Benchmark for copper.

112.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on December 12, 2024 contained copper in concentrations in excess of the U.S. EPA Benchmark for copper.

113.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on January 24, 2024 contained copper in concentrations in excess of the U.S. EPA Benchmark for copper.

114.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on January 10, 2024 contained copper in concentrations in excess of the U.S. EPA Benchmark for copper.

115.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on December 29, 2023 contained copper in concentrations in excess of the U.S. EPA Benchmark for copper.

116.    The storm water samples collected by Defendants at the Facility's sampling points

MP-1, MP-2, MP-3, and MP-4 on December 6, 2023 contained copper in concentrations in excess of the U.S. EPA Benchmark for copper.

117.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-3, and MP-4 on February 24, 2023 contained copper in concentrations in excess of the U.S. EPA Benchmark for copper.

118.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on February 3, 2023 contained copper in concentrations in excess of the U.S. EPA Benchmark for copper.

119.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on November 8, 2022 contained copper in concentrations in excess of the U.S. EPA Benchmark for copper.

120.    The storm water samples collected by Defendants at the Facility's sampling points MP-1, MP-2, MP-3, and MP-4 on November 1, 2022 contained copper in concentrations in excess of the U.S. EPA Benchmark for copper.

121.    A true and accurate summary of the data (as reported by Defendants to the State Board via the SMARTS database) that are the basis for the allegations contained in paragraphs 87-120 is contained in Section 3 of the CWA Notice Letter.

122.    Exceedances of the U.S. EPA Benchmarks evidence repeated failures to develop, implement, and/or maintain BMPs for the Facility that achieve BAT/BCT-level pollutant reductions.

123.    Failures to develop, implement, and/or maintain BMPs at the Facility that achieve BAT/BCT-level pollutant reductions are violations of the General Permit's technology-based effluent limitations and the Act.

124.    Each industrial process undertaken by Defendants at the Facility represents a pollutant source that, pursuant to the General Permit, must be disclosed, assessed, and controlled to prevent or limit pollutant concentrations in storm water discharges.  General Permit, § X.G.1-2.

125.    The 2023 SWPPP for the Facility fails to adequately evaluate the effectiveness of the BMPs implemented at the Facility.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

126.    Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

127.    Defendants' SWPPP does not include a compliant site map, adequate pollutant source descriptions or assessments, adequate BMPs or descriptions of BMPs.

128.    The discharge of storm water from the Facility containing pollutant concentrations exceeding U.S. EPA Benchmarks evidence a failure to develop, implement, and revise a lawful SWPPP.

129.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the General Permit.

130.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to revise the MIP for the Facility as necessary to ensure compliance with Section XI of the General Permit.

131.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to implement the MIP at the Facility, in violation of Section XI of the General Permit.

132.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the General Permit.

133.    CSPA is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to sample storm water discharges from all discharge locations, in violation of Section XI of the General Permit.

134.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the General Permit in violation of Section XI of the General Permit.

135.    CSPA is informed and believes, and thereon alleges, that Defendants consistently fail to perform visual observations of storm water during QSEs.

Complaint For Declaratory and                    21                    Case No.
Injunctive Relief and Civil Penalties

136.    CSPA is informed and believes, and thereon alleges, that Defendants have consistently failed and continue to fail to report any noncompliance with the General Permit at the time that the Annual Report is submitted.

137.    CSPA is informed and believes, and thereon alleges, that Defendants did not report their non-compliance as required by the General Permit.

138.    CSPA is informed and believes, and thereon alleges, that the Facility's ERA Reports from recent reporting years were insufficient, requiring ineffective BMPs and no substantial advanced BMP upgrades resulting in continuing noncompliance with the General Permit.

139.    CSPA is informed and believes, and thereon alleges, that Defendants fail to collect sufficient storm water samples during QSEs.

140.    Information available to CSPA also suggests that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the General Permit and/or the CWA.

141.    CSPA is informed and believes, and thereon alleges, that Defendants have failed to submit complete Annual Reports to the Regional Board for the past five reporting years in violation of Section XVI of the General Permit.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Defendants' Discharges of Contaminated Storm Water from the Facility
Violate the General Permit's Receiving Water Limitations and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

142.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

143.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

144.    CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the

Facility occur every time storm water discharges from the Facility. Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit and the CWA. See General Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

145.    Defendants violate and will continue to violate the General Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

146.    CSPA is informed and believes, and thereon alleges, that Defendants' violations of Effluent Limitations of the General Permit and the CWA are ongoing and continuous.

147.    Each day, since at least May 13, 2020, that Defendants discharge storm water containing pollutants in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

148.    By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 13, 2020 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

149.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm CSPA has no plain, speedy, or adequate remedy at law.

150.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

151.    WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

### SECOND CLAIM FOR RELIEF
**Defendants' Failure to Prepare, Implement, Review, and
Update a Compliant Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

152.    CSPA re-alleges and incorporates all preceding paragraphs as if fully set forth

herein.

153.    CSPA is informed and believes, and thereon alleges, that Defendants have failed to develop and implement an adequate SWPPP for the Facility.

154.    CSPA is informed and believes, and thereon alleges, that Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit. General Permit, Sections X.B.1 and X.C.1.b. Defendants continue to be in violation of the Act each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

155.    Defendants' violations of the General Permit's SWPPP requirements are ongoing and continuous.

156.    Each day since May 13, 2020 that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

157.    Defendants have been in violation of the General Permit's SWPPP requirements every day since May 13, 2020.  Violations continue each day that an adequate SWPPP for the Facility is not developed and fully implemented.

158.    Defendants are subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 13, 2020 to the present, pursuant to sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

159.    An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. § 1365(a).  Continuing commission of the actions and omissions alleged above would irreparably harm CSPA and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

160.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

161.    WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

//

**THIRD CLAIM FOR RELIEF**
**Failure to Develop and Implement the Best Available**
**And Best Conventional Treatment Technologies at the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

162.    CSPA re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

163.    CSPA is informed and believes, and thereon alleges, that Defendants have failed, and continue to fail, to reduce or prevent pollutants associated with their industrial activities from being discharged to waters of the United States through the implementation of BMPs at the Facility that achieve the technology-based BAT/BCT treatment standards.

164.    CSPA is informed and believes, and thereon alleges, that Defendants discharge storm water from the Facility containing concentrations of pollutants exceeding the BAT/BCT level of control during every significant rain event.

165.    CSPA is informed and believes, and thereon alleges, that Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit's Effluent Limitations and the Act. *See* General Permit, §§ I.D.32, V.A; 33 U.S.C. § 1311(b).

166.    CSPA is informed and believes, and thereon alleges, that Defendants violate and will continue to violate the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutants exceeding the BAT/BCT level of control are discharged from the Facility.

167.    Each and every violation of the General Permit's technology-based effluent limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

168.    Defendants' violations of the General Permit's technology-based effluent limitations and the Act are ongoing and continuous.

169.    Defendants are subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 13, 2020 to the present, pursuant to sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

170.    An action for injunctive relief is authorized by section 505(a) of the Act.  33

U.S.C. § 1365(a). Continuing commission of the actions and omissions alleged above would irreparably harm CSPA and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

171.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

172.    WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

## FOURTH CLAIM FOR RELIEF
### Failure to Develop, Implement, and Revise an Adequate Monitoring Implementation Plan for the Facility
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

173.    CSPA re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

174.    CSPA is informed and believes, and thereon alleges, that Defendants have failed to develop a legally adequate monitoring and reporting program for the Facility.

175.    CSPA is informed and believes, and thereon alleges, that Defendants have failed to implement a legally adequate monitoring and reporting program for the Facility.

176.    CSPA is informed and believes, and thereon alleges, that Defendants have failed to adequately revise their monitoring and reporting program for the Facility.

177.    Defendants' violations of the General Permit's Monitoring Plan requirements and the Act are ongoing and continuous.

178.    Defendants are subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 13, 2020 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

179.    An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the actions and omissions alleged above would irreparably harm CSPA and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

180.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

26

Case No.

181.    WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

### FIFTH CLAIM FOR RELIEF
**Defendants' Failure to Report as Required by the General Permit in Violation of the General Permit and the Clean Water Act**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))**

182.    CSPA re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

183.    CSPA is informed and believes, and thereon alleges, that Defendants have failed to accurately report their non-compliance with the General Permit and correctly report storm water sampling analysis compliance in the Facility's Annual Reports. As such, Defendants are in daily violation of the General Permit.

184.    Defendants have been in violation of Sections XVI and XX of the General Permit since at least May 13, 2020.

185.    Defendants' violations of the General Permit's reporting requirements and the Act are ongoing and continuous.

186.    Defendants are subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 13, 2020 to the present, pursuant to sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

187.    An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. § 1365(a).  Continuing commission of the actions and omissions alleged above would irreparably harm CSPA and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

188.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

189.    WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

//

//

Complaint For Declaratory and                27                Case No.
Injunctive Relief and Civil Penalties

VII.     **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.     Declare Defendants to have violated and to be in violation of the General Permit and the Clean Water Act as alleged herein;

b.     Enjoin Defendants from discharging polluted storm water from the Facility except as authorized by the General Permit;

c.     Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d.     Order Defendants to immediately implement storm water pollution control technologies and measures that satisfy BAT and BCT and that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.     Order Defendants to comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.     Order Defendants to prepare a SWPPP for its Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.     Order Defendant to pay civil penalties of $68,445 per day per violation for all violations occurring after November 2, 2015, where penalties are assessed on or after January 8, 2025, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4;

h.     Order Defendants to take appropriate actions to restore the quality of navigable waters impaired or adversely affected by their activities;

i.     Award Plaintiff's costs and fees (including reasonable investigative, attorney, witness, compliance oversight and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

//

//

Complaint For Declaratory and                    28                    Case No.
Injunctive Relief and Civil Penalties

j.    Award any such other and further relief as this Court may deem appropriate.

Dated: July 14, 2025                    Respectfully Submitted,

                                        LAW OFFICE OF WILLIAM CARLON

                            By:    /s/ William N. Carlon
                                   William N. Carlon
                                   Attorneys for Plaintiff
                                   CALIFORNIA SPORTFISHING
                                   PROTECTION ALLIANCE