WILLIAM N. CARLON (State Bar No. 305739)
Law Office of William Carlon
437 Post Street
Napa, CA 94559
Tel: (530) 514-4115
Email: william@carlonlaw.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a California non-profit association,<br><br>Plaintiff,<br><br>v.<br><br>BFI WASTE SYSTEMS OF NORTH AMERICA, LLC, a Delaware limited liability company,<br><br>Defendant. | Case No.: 3:25-cv-05868-LB<br><br>**[PROPOSED] CONSENT DECREE** |

# CONSENT DECREE

**WHEREAS,** Plaintiff California Sportfishing Protection Alliance ("CSPA" or "Plaintiff") is a 501(c)(3) non-profit public benefit corporation organized under the laws of the State of California, with its main office in Berkeley, California;

**WHEREAS,** CSPA is dedicated to protecting California surface waters from pollution and degradation, among other objectives;

**WHEREAS**, Defendant BFI Waste Systems of North America, LLC ("Defendant") owns and operates a facility at 42600 Boyce Road in Fremont, California, under Waste Discharger Identification number 2 01I011668 ("Facility");

**WHEREAS**, the Facility's industrial activities consist of commercial vehicle parking; commercial vehicle refueling; commercial vehicle repairing; storage and maintenance of portable waste containers; and operation of equipment in support of these activities.

The Facility is categorized under Standard Industrial Classification ("SIC") Code 4212, covering Local Trucking Without Storage;

**WHEREAS**, storm water discharges associated with industrial activity at the Facility are regulated by the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order 2014-0057-DWQ, as amended by Order Nos. 2015-0122-DWQ and 2018-0028-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Load Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, at the Facility ("General Permit" or "Permit")[1], and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.* ("Clean Water Act" or

---

[1] Any references to the "General Permit" or "Permit" herein shall be to the then-effective version, regardless of whether such changes are the result of amendments, revisions, reissuance, or similar modification of material terms. Any reference in this Consent Decree to specific sections or subsections of the General Permit that are moved, modified, or otherwise changed in a subsequent version of the General Permit shall be to such subsequent reference(s) as if set forth herein, *e.g.*, the current §XI.B.6.c may be renumbered as §XI.B.7.c, combined into the current §XI.B.6.d, or split into a new §XI.B.6.c and §XI.B.6.d.

"CWA"), Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342;

**WHEREAS**, Plaintiff contends that Defendant's operations at the Facility result in the alleged discharges of pollutants into waters of the United States and are regulated by the Clean Water Act Sections 301(a) and 402. 33 U.S.C. §§ 1311(a), 1342;

**WHEREAS**, the General Permit requires all permittees, including Defendant, to comply with, inter alia, the following mandates: (1) develop and implement a storm water pollution prevention plan and a storm water monitoring implementation plan, (2) control pollutant discharges using, as applicable, best available technology economically achievable or best conventional pollutant control technology to prevent or reduce pollutants through the development and application of Best Management Practices, which must be detailed in and timely updated in the SWPPP, (3) reduce and/or eliminate discharges necessary to comply with any and all applicable Water Quality Standards, and (4) implement a monitoring and reporting program, including the MIP, designed to assess compliance with the Permit;

**WHEREAS**, on May 13, 2025, Plaintiff issued a notice of intent to file suit ("60-Day Notice Letter") to Defendant, its registered agent, the Administrator of the United States Environmental Protection Agency ("EPA"), the Executive Director of the State Water Resources Control Board ("State Board"), the Executive Director of the San Francisco Bay Regional Water Quality Control Board ("Regional Board"), and the Regional Administrator of EPA Region IX, alleging violations of the Clean Water Act and the General Permit;

**WHEREAS**, on July 14, 2025, CSPA filed a complaint against Defendant in the Northern District of California ("Court"), Civil Case No.3:25-cv-05868-LB ("Complaint");

**WHEREAS**, Plaintiff's Complaint alleged violations of the General Permit and the Clean Water Act for Defendant's discharges of pollutants into storm drains

and surface waters, including the Lower San Francisco Bay and the Pacific Ocean (collectively, "Receiving Waters");

**WHEREAS**, Plaintiff and Defendant (collectively, "Settling Parties" or "Parties"), without waiving or admitting any claim of liability and to resolve disputed issues, agree that it is in their mutual interest to enter into a Consent Decree setting forth terms and conditions appropriate to resolving the allegations set forth in the 60-Day Notice Letter and Complaint without further proceedings;

**WHEREAS**, all actions taken by Defendant pursuant to this Consent Decree shall be made in compliance with all applicable federal, state and local laws, rules and regulations.

**NOW, THEREFORE, IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1. The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the CWA, 33 U.S.C. § 1365(a)(1)(A).

2. Venue is appropriate in the Northern District Court pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations are taking place is located within this District.

3. The Complaint states a claim upon which relief may be granted against Defendant pursuant to Section 505 of the CWA, 33 U.S.C. § 1365.

4. CSPA has standing to bring this action.

5. The Court shall retain jurisdiction over this action for purposes of interpreting, modifying, or enforcing the terms of this Consent Decree, or as long thereafter as necessary for the Court to resolve any motion to enforce this Consent Decree, but only regarding issues raised within the Term (as defined below) of this Consent Decree.

## I. OBJECTIVES

6. It is the express purpose of the Settling Parties through this Consent Decree to further the objectives of the Clean Water Act, and to resolve all issues alleged by CSPA in its 60-Day Notice Letter and Complaint. These objectives include compliance with the provisions of this Consent Decree, compliance with all terms and conditions of the General Permit, and compliance with all applicable sections of the CWA.

7. In light of these objectives and as set forth fully below, Defendant agrees to comply with the provisions of this Consent Decree, terms and conditions of the General Permit, and all applicable sections of the CWA at the Facility.

## II. AGENCY REVIEW AND DEFINITIONS

### A. AGENCY REVIEW OF CONSENT DECREE

8. Agency Review. Plaintiff shall submit this Consent Decree to the United States Department of Justice and the EPA (the "Federal Agencies") for agency review consistent with 40 C.F.R. § 135.5. The agency review period expires forty-five (45) calendar days after receipt by the Federal Agencies, as evidenced by certified return receipts, or upon the date that the Federal Agencies provide a no objection letter, whichever is earlier ("Agency Review Period"). In the event that the Federal Agencies object to entry of this Consent Decree or to any portion of this Consent Decree, the Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies. If the Parties are unable to resolve any issue(s) raised by the Federal Agencies in their comments, the Parties agree to expeditiously seek a settlement conference with the assigned Magistrate Judge to resolve any issue(s).

9. Court Notice. Plaintiff shall notify the Court of the receipt date by the Federal Agencies, as required by 40 C.F.R. § 135.5, in order to coordinate the Court's calendar with the 45-day review period.

10. Entry of Consent Decree. Following the expiration of the Agency Review Period, Plaintiff shall submit the Consent Decree to the Court for entry.

## B. Definitions

11. Unless otherwise expressly defined herein, terms used in this Consent Decree which are defined in the CWA or in regulations or rules promulgated under the CWA have the meaning assigned to them in the statutes or regulations or rules. Whenever terms listed below are used in this Consent Decree, whether or not capitalized, the following definitions apply:

a. "BAT" means the Best Available Technology Economically Achievable.

b. "BCT" means the Best Conventional Pollutant Control Technology, and collectively with BAT is referred to herein as "BAT/BCT."

c. "BMPs" means Best Management Practices as defined in Attachment C (Glossary) of the General Permit.

d. "Consent Decree" means this Consent Decree and any attachments or documents incorporated by reference.

e. "Day" means a calendar day. In computing any period of time under this Consent Decree, where the last day of such period is a Saturday, Sunday, or Federal or State Holiday, the period runs until the close of business on the next day that is not a Saturday, Sunday, or Federal or State Holiday.

f. "Design Storm" means the volume and flow rate of runoff produced from a design storm as defined by General Permit Section X.H.6.

g. "Discharge Point" means each discharge location designated in the then-current SWPPP for the Facility.

h. "Effective Date" means the effective date of this Consent Decree, which shall be the date of full execution by the Parties.

i. "Entry Date" means the day this Consent Decree is approved and entered by the Court.

j. "Forecasted Rain Event" means a forecasted rain event as determined by the National Oceanic and Atmospheric Administration with an expected onset at the Facility within 24 hours.

k. "MIP" means a Monitoring Implementation Plan.

l. "PPT" means Pollution Prevention Team.

m. "Qualified Industrial Storm Water Practitioner" or "QISP" shall have the definition set forth in Section IX.A.1 of the General Permit.

n. "Qualifying Storm Event" or "QSE" shall have the definition set forth in Section XI.B.1 of the General Permit.

o. "Reporting Year" means the period from July 1 of a given calendar year to June 30 of the following calendar year.

p. "SMARTS" means the California State Water Resources Control Board's Stormwater Multiple Application and Report Tracking System.

q. "SWPPP" means a Storm Water Pollution Prevention Plan.

r. "Term" means the period between the Effective Date and the "Termination Date."

s. "Termination Date" means the latest of:

i. June 30 following four (4) years from the Effective Date;

ii. June 30 following two (2) years after the treatment system is fully installed, operational, and optimized in accordance with the manufacturer's specifications;

iii. seven (7) days from the conclusion of any proceeding or process to enforce the Consent Decree initiated prior to the later of dates in Paragraphs 11.s.i. and 11.s.ii. above; or

iv. seven (7) days from Defendant's completion of all payments and other affirmative duties required by this Consent Decree.

t. "Wet Season" means the period beginning October 1st of any given calendar year and ending April 30th of the following calendar year.

## III. COMMITMENTS OF THE SETTLING PARTIES

### A. Storm Water Pollution Control Best Management Practices

12. Non-Storm Water Discharge Prohibition. Any unauthorized non-storm water discharge, as defined in the General Permit, shall be a violation of this Consent Decree.

13. Current and Additional Best Management Practices. At all times, Defendant shall implement BMPs identified in its SWPPP and BMPs described herein, and shall develop and implement additional BMPs as necessary to comply with the provisions of this Consent Decree and the General Permit, including but not limited to those (1) necessary to comply with BAT/BCT-level pollutant reductions, where applicable; and (2) the General Permit's Receiving Water Limitations, which require that discharges from the Facility "not cause or contribute to an exceedance of any applicable water quality standards" contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

14. Rain Gauge/Sensor. Defendant shall install and maintain an electronic rain gauge or sensor at the Facility within ten (10) days of the Effective Date. The rain gauge/sensor shall be capable of measuring precipitation down to at least 0.1 inches, and record start/stop times and non-cumulative precipitation for each rain event. During the Term, Defendant shall collect data using the gauge/sensor for all

precipitation events to the nearest 0.1 inch, including start/stop times. Data from the rain gauge/sensor shall be conclusive of precipitation quantities and timing for purposes of this Consent Decree.

15. Structural and Non-Structural BMPs for the Facility.

a. Unless otherwise stated below, as soon as possible but no later than forty-five (45) days of the Effective Date, Defendant shall develop and implement the following BMPs at the Facility:

i. *Wash Rack Containment and Treatment.* By October 15, 2026, Defendant shall install rubber bumper strips as shown in **Exhibit 1** (see exhibit description below**)** at the wash station entrance and exit to capture wash water and other contaminants entrained on truck tires and equipment. Defendant shall ensure that all wash water, including water from bin cleaning and vehicle/equipment washing activities, is fully contained within the wash station area and conveyed to the sanitary sewer. Any modifications necessary to ensure complete containment—such as regrading, berm repairs, or replacement—shall be completed as part of the implementation of this requirement;

ii. *Material Handling and Storage Improvements.* All outdoor storage containers used for storing soiled recyclable materials shall be equipped with tight-fitting, leak-resistant lids. Lids shall remain securely closed at all times during the Wet Season except during active loading or unloading. Defendant shall establish and implement a written protocol requiring the immediate cleanup of any spilled recyclable or waste materials in outdoor areas.

iii. *Maintenance Building Controls.* All maintenance activities that generate pollutants (including fluid handling, parts washing, and mechanical repairs) shall be conducted exclusively on covered, bermed or otherwise contained surfaces with no direct or indirect

connection to any storm drain system. Containment areas shall be designed to capture spills, drips, and wash water. Defendant shall implement a weekly sweeping program during the Wet Season for paved areas immediately adjacent to the Maintenance Building entrances but shall sweep daily within forty-eight (48) hours prior to each Forecasted Rain Event.

iv. *Temporary Coverage Protocols.* For all applicable areas and storage containers, Defendant shall deploy tarps or equivalent temporary covers no later than 48 hours prior to any Forecasted Rain Event. The following materials and containers shall be covered in accordance with this protocol: a) Roll-off bins containing recyclable, organic, or waste materials that have not been dumped prior to delivery to the site; b) Any containerized stored materials that are not equipped with secure, tight-fitting, weather-resistant lids; and

c) Any other equipment or material stockpiles that pose a risk of pollutant discharge through stormwater exposure, as identified in Defendant's SWPPP;

v. *Vehicle Parking and Maintenance Area Improvements.* Defendant shall develop and implement a written vehicle inspection program. The program shall:

a. Require routine visual inspection of each vehicle to identify fluid leaks;
b. Prohibit overnight parking of vehicles with active fluid leaks unless they are contained within a bermed or covered area, or where the leaks are otherwise captured by an appropriate receptacle such as a drip pan;
c. Require timely repair or removal of leaking vehicles from service; and,

d. Require immediate cleanup of any fluid leaks or spills observed in industrial parking, maintenance, or staging areas;

vi. *Sweeping Program.* Implement a sweeping program using a regenerative air or vacuum sweeper of a type certified by the Bay Area Air Quality Management District with the capacity to collect and retain PM-10 (10 µm) particles on all paved areas at least once per month outside of the Wet Season, once per week during the Wet Season, and within twenty-four (24) hours prior to a Forecasted Rain Event, and employ hand sweeping and/or vacuuming on the same schedule in areas a mechanical sweeper cannot access;

vii. *Pre-rain Protocol.* Institute a formal pre-rain protocol throughout the Wet Season to be implemented within twenty-four (24) hours prior to a Forecasted Rain Event, involving inspection of any filters and wattles deployed at the site, removal of any exposed waste material, and relocation of uncontained or uncovered debris bins and trash cans under cover;

viii. *Housekeeping.* Remove, and prevent the storage of, all permanently abandoned racks, vehicles, equipment, and paint from the entire property;

ix. *Equipment and Vehicle Maintenance Program.* Institute an equipment and vehicle maintenance program that ensures:

1. no maintenance activities occur outdoors during wet weather, unless such maintenance is required for safe operation of the Facility, *e.g.*, the forklift breaks down in a location that prevents ingress/egress;
2. maintenance activities occur only in designated work areas or beneath covered maintenance areas; and

3. when maintenance activities must be performed outdoors, action shall be taken to immediately contain, capture, and clean up any discharge or spills of waste fluids to the ground;

x. *BMP Maintenance Program.* Defendant shall develop and implement a written comprehensive preventative maintenance program for all treatment BMPs, including; a) Regular cleaning and replacement of filter media before design capacity is reached; and, b) Inspection and cleaning of oil-water separators (if any) as needed, and at least quarterly;

xi. Within fourteen (14) days of each of the above BMPs being implemented, Defendant shall confirm to CSPA in writing, with photographs, that such BMP has been implemented as set forth above.

b. *Advanced Treatment System.*

i. *Treatment Train.* Within ninety (90) days of the Effective Date, Defendant shall submit all applications for the permits and approvals required to construct and operate an advanced stormwater treatment system at the Facility (the "Treatment System") to treat stormwater runoff from each industrial drainage area. The Treatment System is described in the conceptual proposal from Weaver Consultants, as understood by the parties based on documentation attached to this Consent Decree as **Exhibit 1**, and shall comprise, at a minimum:

A. *Initial Separation Stage.* A hydrodynamic separator, settling structure, or functionally equivalent device designed to remove coarse sediment, trash, and free-phase oil and grease, and to reduce solids loading on the Media Filtration Stage;

B. *Media Filtration Stage.* A media filtration unit containing engineered treatment media selected for the pollutants in Table 1,

with media being selected for target concentrations in the media filter box outlet that are no higher than the corresponding concentrations in Table 1.

C. *High-Flow Bypass.* A high-flow bypass upstream of the Media Filtration Stage to prevent scouring of filtration media;

D. *Sampling Ports.* Sampling ports at the outlet of each treatment stage; and,

E. *Maintenance Access.* Maintenance Access sufficient to permit inspection, sediment removal, and media replacement without excavation.

All Treatment System components shall be sized to capture and treat the Design Storm flows and volumes required under the General Permit.

ii. *Reasonable Diligence.* Defendant shall prosecute the applications required to complete the Treatment System, or any Alternative Treatment System, with reasonable diligence, including responding to requests from governmental agencies or its landlord within ten (10) business days. Defendant shall use best efforts to obtain any landlord approval required for the Treatment System, or Alternative Treatment System, and shall notify Plaintiff within seven (7) days if such approval is requested and not obtained.

iii. *Alternative Treatment System.* If, despite diligent prosecution under Section 15.b.i, (a) a governmental agency denies in writing a complete application for a permit or approval required for the Treatment System, or fails to act within a reasonable time on such a complete application notwithstanding Defendant's timely response to all agency requests, or (b) Defendant's landlord declines in writing to approve the Treatment System, then:

A. Defendant shall notify Plaintiff in writing within seven (7) days, enclosing all correspondence with the agency or landlord and the stated basis for the denial or non-action;

B. Within ninety (90) days thereafter, Defendant shall submit to Plaintiff a plan to design, install, operate, and optimize an alternative advanced stormwater treatment system ("Alternative Treatment System") that is reasonably capable of obtaining the required permits, approvals, and landlord consent, and that is designed to comply with General Permit section X.H.2;

C. Plaintiff shall have thirty (30) days to review and comment, with any dispute resolved under Section IV (Dispute Resolution); and

D. Within thirty (30) days of receiving CSPA's comments or the resolution of any dispute under subparagraph vi. above, and assuming no Dispute Resolution process is pending, Defendant shall submit all applications for the permits and approvals required to construct and operate the Alternative Treatment System. Defendant shall thereafter prosecute those applications with reasonable diligence, as described above in section 15.b.ii.

iv. Within nine months of having obtained all permits and approvals, Defendant shall have designed, installed, operated, and optimized the Treatment System, or Alternative Treatment System.

v. Defendant bears the burden of demonstrating that any delay, denial or non-action occurred despite Defendant's diligent prosecution. The unavailability of any particular permit, approval, or design shall not excuse Defendant's obligation to install an advanced stormwater treatment system meeting the performance criteria in section X.H.2 of the General Permit.

vi. *Interim BMPs Pending Treatment System Installation.* From the Effective Date through installation of the Treatment System, Defendant shall:

A. Maintain the existing drop-inlet filters in all Facility drain inlets under an enhanced maintenance program requiring (i) replacement of filter media at least monthly throughout each Wet Season, (ii) weekly inspection during each Wet Season, and (iii) documented media-change logs provided to CSPA upon request;

## B. SAMPLING AT THE FACILITY

16. Defendant shall develop a monitoring program consistent with the General Permit. During the Term, Defendant shall collect samples of storm water discharge from each Discharge Point from all Qualifying Storm Events that occur during scheduled facility operation hours. Such sampling shall take place as soon as possible within the four (4) hour period required by the General Permit § XI.B.5. If a rain event occurs during scheduled facility operating hours that meets the antecedent dry period of a Qualifying Storm Event but does not produce a discharge from a Discharge Point, then Defendant shall document the inability to sample by taking photographs during the rain event of each Discharge Point from which no discharge occurred. Defendant shall submit such photographs to CSPA by email, along with rain gauge/sensor data for the date of such rain event, within five (5) days of a written request for such records by CSPA.

17. <u>Sampling Parameters</u>. All samples collected pursuant to this Consent Decree shall be analyzed, at minimum, for the parameters listed in Table 1. Should Defendant intend to conduct sampling for any additional parameters that are listed in 40 C.F.R. § 131.38 and/or in the General Permit for any reason, including without limitation as a result of changed operations, a revised pollutant source assessment, or a new mandate from a regulatory agency, such parameter shall be incorporated into

this Consent Decree as if listed in Table 1 for all purposes, including any Action Plan requirements (as defined below). Defendant shall immediately notify CSPA of its intent to conduct sampling for any such additional parameters and the Parties shall meet and confer regarding the applicable Table 1 limit for such purposes within ten (10) days of such notification.

18. Laboratory and Holding Time. Except for pH samples, Defendant shall deliver all samples to a California-certified environmental laboratory for analysis within allowable hold times, pursuant to 40 C.F.R. Part 136. Analysis of pH will be completed onsite using a portable instrument that is calibrated and used according to the manufacturer's instructions.

19. Detection Limit. Defendant shall request that the laboratory use analytical methods adequate to detect the individual contaminants at or below the values specified in the General Permit and Table 1 below.

20. Reporting. Defendant shall provide complete laboratory results of all samples collected at the Facility to SMARTS in accordance with the General Permit, and shall provide copies to CSPA within fourteen (14) days of receiving the laboratory report with the results.

### C. REDUCTION OF POLLUTANTS IN DISCHARGES

21. Table 1 Numeric Limits. Defendant shall develop and implement BMPs for storm water discharges from the Facility that reduce pollutant concentrations to levels below those in Table 1, consistent with the requirements of the General Permit.

**TABLE 1**

| Parameter | Numeric Limit | Source of Limit |
|---|---|---|
| Total Suspended Solids | 100 mg/L (annual)<br>400 mg/L; (instantaneous) | NAL |
| pH | 6.0-9.0 SU (instantaneous) | NAL |
| Oil & Grease | 15 mg/L (annual);<br>25 mg/L (instantaneous) | NAL |
| Chemical Oxygen Demand | 120 mg/L (annual) | NAL |
| Copper | 0.0332 mg/L (annual) | NAL |
| Zinc | 0.26 mg/L (annual) | NAL |

22. Table 1 Exceedances. An "Exceedance" of Table 1 is defined as follows: (a) where the arithmetic average concentration of the same pollutant in any two (2) storm water samples from the Facility during a Reporting Year exceeds the annual numeric limit contained in Table 1; and/or (b) where the concentration of any pollutant in any two or more storm water samples from the Facility exceeds an instantaneous numeric limit contained in Table 1.

23. Action Plan for Table 1 Exceedances. As of the Effective Date, and for the remainder of the Term, if (a) Defendant has an unauthorized non-storm water discharge in violation of Paragraph 12, or (b) after the Treatment System is fully installed, operational, and optimized storm water samples demonstrate an Exceedance as defined above, or (c) after the Treatment System is fully installed, operational, and optimized, and the Treatment System discharges untreated storm water in smaller than a Design Storm, (each a "Trigger Event"), Defendant shall prepare and submit to CSPA a plan for reducing and/or eliminating the relevant discharge of pollutants for the Facility and/or achieving compliance with the non-storm water discharge prohibition, and/or eliminating discharges in smaller than a Design Storm ("Action Plan"). The complete Action Plan shall be submitted to CSPA within thirty (30) days of the unauthorized non-storm water discharge, the discharge of untreated storm water in smaller than a Design Storm, or the receipt of the laboratory report

demonstrating the Exceedance, as applicable. A single Action Plan may address multiple Trigger Events, provided the Action Plan is submitted to CSPA by the earliest submission deadline applicable to any Trigger Event addressed therein. Moreover, an Action Plan shall not be required when the BMPs for (a) the applicable unauthorized non-storm water discharge, (b) Exceedance for the same pollutant in the same drainage area[2], or (c) applicable discharge in smaller than a Design Storm were addressed in a previous Action Plan in the same Reporting Year and such BMPs were not yet implemented as of the date of the applicable unauthorized non-storm water discharge, QSE sampling that led to the Exceedance, or applicable discharge in smaller than a Design Storm.

a. Action Plan Requirements. Each complete Action Plan submitted shall include at a minimum: (1) the identification of the contaminant(s) discharged in excess of the numeric limit(s) and/or the applicable unauthorized non-storm water discharge and/or the applicable discharge in smaller than a Design Storm; (2) an assessment of the source or cause of each contaminant exceedance and/or applicable unauthorized non-storm water discharge and/or discharge in smaller than a Design Storm; (3) the identification of additional or modified BMPs that shall be implemented to achieve compliance with the numeric limit(s) and/or unauthorized non-storm water discharge prohibition and/or the discharge in smaller than a Design Storm, as well as the design plans and calculations of these BMPs; and (4) time schedules for implementation of the proposed BMPs. The time schedule(s) for implementation shall ensure that all BMPs are

[2] For clarity, an Action Plan based on an Exceedance shall be required if: (a) the applicable Exceedance is demonstrated for a pollutant and/or drainage area not addressed in a previous Action Plan in the same Reporting Year; and/or (b) when the applicable Exceedance is demonstrated for the same pollutant as in a previous Action Plan in the same Reporting Year and the BMPs in the previous Action Plan were fully implemented before the applicable QSE that led to the Exceedance was sampled.

implemented as soon as practicable. Within seven (7) days of each of the BMPs set forth in the Action Plan being implemented, Defendant shall confirm to CSPA in writing, with photographs, that such BMP has been implemented as set forth in the Action Plan.

b. Action Plan Proposed BMPs. The following BMPs should generally be evaluated for inclusion in Action Plans to attain the Table 1 levels in the Facility's storm water discharges:

i. Hydrologic Controls. Installation of additional berms or equivalent structural controls necessary to reduce or prevent storm water from flowing off site other than through the engineered storm water conveyance system or storm water retention or treatment facilities.

ii. Sweeping. The increased/more frequent use of sweepers and manual sweeping in otherwise inaccessible areas.

iii. Treatment Systems. Installing different filter media in the Treatment System media box(es) or making changes to the operation and maintenance protocols for such system, to provide more effective filtration treatment of storm water prior to discharge. Provided, however, Defendant shall not be required to excavate, remove, enlarge or modify the hydrodynamic separator or the filter media box to be installed per this Consent Decree as described in paragraph 15 b. above, or to add additional below-ground components to the system.

iv. Evaluation of Existing BMPs. Replacing, rehabilitating, or eliminating existing BMPs, taking into account the age of the BMPs involved or employed, the engineering aspect of

the application of various BMPs, and any adverse environmental impact of the BMPs.

c. Action Plan Review. CSPA shall have thirty (30) days upon receipt of Defendant's complete Action Plan to provide Defendant with comments. Within fourteen (14) days of receiving CSPA's proposed revisions to an Action Plan, Defendant shall consider each of CSPA's recommended revisions and accept them or justify in writing why any comment is not incorporated. Action Plan(s) developed and implemented pursuant to this Consent Decree are an obligation of this Consent Decree. Any disputes as to the adequacy of an Action Plan shall be resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section IV below. Disputes regarding the adequacy of a particular BMP shall not impact the schedule for implementing any other BMP set forth in the Action Plan.

d. Defendant shall revise the then-current SWPPP to reflect the changes required by Defendant's Action Plan, as set forth in Paragraph 28.b below.

e. Action Plan Payments. Defendant shall pay Four Thousand Dollars $4,000) each time an Action Plan is submitted to CSPA. For the avoidance of doubt, a consolidated Action Plan addressing multiple pollutants, multiple Trigger Events, or multiple Discharge Points shall be treated as a single Action Plan submission and shall require only one single payment of Four Thousand Dollars ($4,000). Payments are due at the same time that the applicable Action Plan is submitted and shall be made to "Law Office of William Carlon" via certified mail, return receipt requested to Law Office of William Carlon, c/o William Carlon, 437 Post Street, Napa, California 94559. Failure to submit a

payment as required under this Paragraph will constitute a breach of the Consent Decree.

### D. VISUAL OBSERVATIONS

24. Storm Water Discharge Observations. During the Term, appropriately trained staff of Defendant shall conduct visual observations during the Facility's operating hours during every rain event. Such inspections shall comply with all requirements of Section XI.A.2 of the General Permit, and any successor thereof.

25. Monthly Visual Observations. During the Term, appropriately trained staff of Defendant shall conduct monthly non-storm water visual observations of the Facility. Such inspections shall comply with all requirements of Section XI.A.1 of the General Permit, and any successor thereof. Such monitoring shall include outfalls, Discharge Points, outdoor industrial equipment and storage areas, outdoor industrial activities areas, BMPs, and all other potential sources of industrial pollutants. All Discharge Points shall also be inspected for accumulation of dust, sediment, sand, grit, oily substances, oily sheens upon any standing water, and other materials associated with operations at the Facility. During the Wet Season, such inspections shall further include observations of all storm water BMPs that are used only during the Wet Season at the Facility to ensure that operational BMPs are being implemented, structural BMPs are in good condition or working order, and that BMPs have been effective in producing clean conditions at the Facility. Such inspections shall further include observation as to whether there are any non-storm water discharges from the Facility.

26. Visual Observations Records. Defendant shall maintain observation records, including photographs, to document compliance with Paragraphs 24 and 25. Such records shall include, but not be limited to, the persons who completed the inspection, the date of the inspection, and notes sufficient to describe the completed activity and all observations thereof, including but not limited to: (i) whether BMPs are in an proper, working condition; (ii) whether any repair, replacement, or operation

and maintenance is needed for any BMPs; (iii) other conditions that have the potential to lead to pollutant loading in storm water discharges; and (iv) photographs of all the foregoing. Defendant shall provide CSPA with a copy of those records within fourteen (14) days of receipt of a written request from CSPA for those records.

27. Employee Training Program. Within thirty (30) days of the Effective Date, Defendant shall develop and implement an employee training program that meets the following requirements and ensures (1) that there is a sufficient number of employees at the Facility designated to achieve compliance with the General Permit and this Consent Decree ("Designated Employees"), and (2) that these Designated Employees are properly trained to perform the activities required by the General Permit and this Consent Decree ("Training Program"):

a. Materials. Training materials should include, at minimum, a detailed Training Manual or Standard Operating Procedure, including drawings and diagrams where appropriate, for reference and use by Defendant's personnel to ensure effective implementation of all BMPs at the Facility;

b. Language. The training and training materials shall be available and offered in the language(s) in which relevant employees are fluent. If necessary, Defendant shall provide a translator or translators at all trainings where such translation is likely to improve staff comprehension of the Training Program and improve compliance with this Consent Decree and the General Permit;

c. Training Frequency. Training shall be provided by a QISP familiar with the requirements of this Consent Decree and the General Permit, and shall be repeated as necessary to ensure that all relevant employees are familiar with the requirements of this Consent Decree, the Permit, and the Facility's SWPPP. All relevant new staff shall receive this training before assuming responsibilities for implementing the SWPPP;

d. Sampling Training. Defendant shall designate an adequate number of employees necessary to collect storm water samples as required by this Consent Decree, including training to ensure samples are properly collected, stored, and submitted to a certified laboratory;

e. Visual Observation Training. Defendant shall provide training on how and when to properly conduct visual observations to Designated Employees;

f. Non-Storm Water Discharge Training. Defendant shall train all Designated Employees at the Facility on the General Permit's prohibition of non-storm water discharges, so that Designated Employees know what non-storm water discharges are and how to detect and prevent non-storm water discharges;

g. Employees. All Designated Employees at the Facility shall participate in the Training Program annually. New Designated Employees shall participate in the Training Program within thirty (30) days of their hiring date; and

h. Records. Defendant shall maintain training records to document compliance with this Paragraph and shall provide CSPA with a copy of these records within fourteen (14) days of receipt of a written request.

28. SWPPP Revisions.

a. Initial SWPPP Revisions. Defendant shall amend the Facility's SWPPP to incorporate the requirements in this Consent Decree when implemented, and shall comply with the General Permit and submit the complete, updated SWPPP to CSPA within thirty (30) days of the Effective Date for CSPA's review and comment. The complete, updated SWPPP shall contain, at a minimum, the following elements:

i. A revised pollutant source assessment, including all elements required by section X.G of the General Permit as

well as assessments of the potential for the Facility's storm water discharges to contain pollutants for which the Receiving Waters are 303(d) listed and/or have Total Maximum Daily Loads;

ii. A detailed narrative description and assessment of each industrial activity with the potential to impact storm water quality occurring at the Facility as required by section X.G of the General Permit;

iii. Descriptions of all BMPs in accordance with section X.H.4 of the General Permit, including without limitation BMPs required by this Consent Decree and the anticipated date of their implementation;

iv. A set of site maps that comply with section X.E of the General Permit and provisions of this Consent Decree;

v. A MIP as required by sections XI and X.I of the General Permit;

vi. A designation (by position/title) of employees responsible for carrying out storm water management, monitoring, sampling and SWPPP implementation, e.g., visual inspection of each specific area, monitoring each specific BMP, sampling, etc.; and

vii. A Training Program as described above in Paragraph 27.

b. <u>Additional SWPPP Revisions</u>.

i. Within thirty (30) days after approval of any Action Plan by CSPA (or resolution pursuant to Dispute Resolution), Defendant shall revise the then-current SWPPP to reflect the changes required by the Action Plan and submit the

complete, updated SWPPP to CSPA for CSPA's review and comment.

ii. Within thirty (30) days after any changes in industrial activities, sources of industrial pollutants, changes to Discharge Points, or changes to sections of the SWPPP identified in the SWPPP as requiring a SWPPP revision (including but not limited to, changes in Facility contacts or PPT members, changes or additions of BMPs, or changes in or additions of industrial activities that impact storm water discharge), Defendant shall revise the then-current SWPPP to reflect such changes and submit the complete, updated SWPPP to CSPA for CSPA's review and comment.

c. Review of SWPPP. For any SWPPP updates pursuant to Paragraphs 28.a. and 28.b., CSPA shall have thirty (30) days upon receipt of Defendant's complete SWPPP to provide Defendant with comments. Within thirty (30) days of receiving CSPA's comments and proposed changes to the SWPPP, Defendant shall consider each of the comments and proposed changes and either accept them or justify in writing why a change is not incorporated. The Parties agree to work in good faith to resolve any disputes with respect to the SWPPP, and any remaining disputes will be resolved through timely initiation of the dispute resolution procedures in Section IV below. Following its incorporation of proposed modification or additions (if any) into each revised SWPPP, Defendant shall upload the revised SWPPP to SMARTS.

### E. Compliance Monitoring and Reporting

29. CSPA may conduct one annual site inspection ("Site Inspection") during each Reporting Year during the Term for the purpose of ensuring compliance with this Consent Decree and the General Permit. In the event of a dispute regarding

Defendant's compliance with this Consent Decree, and provided a Site Inspection would be relevant to resolving the Parties' dispute, the Parties agree to meet and confer regarding an additional Site Inspection at Plaintiff's request. Plaintiff shall not unreasonably request, and Defendant shall not unreasonably deny, one additional Site Inspection. Any Site Inspection shall occur during normal business hours, and CSPA will provide Defendant with at least twenty-four (24) hours' notice prior to a Site Inspection. For any Site Inspection requested to occur in wet weather, Plaintiff shall be entitled to adjust timing or reschedule during normal business hours in the event the forecast changes and anticipated precipitation appears unlikely, and thus frustrates the purpose of visiting the Facility in wet weather. Notice will be provided by electronic mail to the individual(s) designated below at Paragraph 57. During a wet weather inspection, Plaintiff may request that Defendant collect a sample of industrial storm water discharge from the Facility's designated industrial discharge point(s) referenced in its SWPPP, to the extent that such discharges are occurring. Defendant shall collect the sample and provide a split sample to CSPA, if requested at the time of sampling. CSPA's representative(s) may observe the split sample(s) being collected by Defendant's representative. CSPA shall be permitted to take photographs or video recording during any Site Inspection.

30. Document Provision. During the Term, Defendant shall notify and submit documents to CSPA as follows:

a. Defendant shall copy CSPA, by electronic mail to the individual(s) designated below at Paragraph 57, on all compliance documents, monitoring and/or sampling data, written communications and/or correspondences, or any documents related to storm water quality at the Facility that are submitted to the Regional Board, the State Board, and/or any state or local agency, county or municipality.

b. Within seven (7) business days of receipt by Defendant, send to CSPA, by electronic mail to the individual(s) designated below at Paragraph

57, any compliance document, inspection report, written communication and/or correspondence, or any document related to storm water quality at the Facility received by Defendant from the Regional Board, the State Board, and/or any state or local agency, county, municipality.

31. Compliance Monitoring. Defendant shall partially defray costs associated with Plaintiff's monitoring of Defendant's compliance with this Consent Decree during the Term through June 30 following four (4) years from the Effective Date by paying Eighteen Thousand Dollars ($18,000) within thirty (30) days of the Entry Date. For each year the Term continues beyond June 30 following four (4) years from the Effective Date, if any, Defendant shall pay Four Thousand Five Hundred Dollars ($4,500.00) per year, with the first such payment being paid on June 30 following four (4) years from the Effective Date, and each subsequent payment on June 30 annually thereafter for the remainder of the Term. The payment shall be made via check, made payable to: "Law Office of William Carlon" via certified mail, return receipt requested to Law Office of William Carlon, c/o William Carlon, 437 Post Street, Napa, California 94559. Failure to submit payment as required under this Paragraph will constitute breach of the Consent Decree.

### F. ENVIRONMENTAL BENEFIT PROJECT, LITIGATION FEES AND COSTS, MISSED DEADLINES, AND INTEREST

32. Environmental Benefit Project. To fund environmental project activities that will reduce or mitigate the impacts of storm water pollution from industrial activities occurring in San Francisco Bay, Defendant shall make a payment totaling Eighty Thousand Dollars ($80,000.00) to the Rose Foundation for Communities and the Environment made within thirty (30) days of the Entry Date, payable to the Rose Foundation for Communities and the Environment and sent via overnight mail to Rose Foundation for Communities and the Environment 201 4th Street, Suite 102,

Oakland, CA 94607. Failure to submit payment as required under this Paragraph will constitute breach of the Consent Decree.

33. CSPA's Fees and Costs. Defendant shall pay a total of Seventy-Seven Thousand Dollars ($77,000.00) to CSPA to partially reimburse Plaintiff for their investigation fees and costs, expert/consultant fees and costs, reasonable attorneys' fees, and other costs incurred as a result of investigating and filing the lawsuit, and negotiating a resolution of this matter within thirty (30) days of the Entry Date. The payment shall be made payable to: "Law Office of William Carlon" and delivered by overnight carrier to Law Office of William Carlon, c/o William Carlon, 437 Post Street, Napa, California 94559. Failure to submit payment as required under this Paragraph will constitute breach of the Consent Decree.

34. Missed Deadlines. In the event that Defendant fails to submit to CSPA any payment, document, report, or communication required by this Consent Decree, Defendant shall pay a stipulated payment of Five Hundred Dollars ($500) per day, provided that CSPA gives Defendant a notice of the delayed payment or submittal and Defendant fails to cure the omission within five (5) business days. Such stipulated payments shall be made by check payable to: Rose Foundation for Communities and the Environment, and such funds shall be used for the sole purpose of funding environmentally beneficial projects, as described in Paragraph 32. Payment shall be sent via overnight mail to Rose Foundation for Communities and the Environment 201 4th Street, Suite 102, Oakland, CA 94607. Defendant agrees to make the stipulated payment within fourteen (14) days after the resolution of the event that precipitated the stipulated payment liability.

35. Interest on Late Payments. Defendant shall pay interest on any payments, fees, or costs owed pursuant to this Consent Decree that are not received by the due date. The interest shall accrue starting the next business day after the payment is due and shall be computed at a rate equal to the lower of: (i) 5% per year (0.416 per month); or (ii) the maximum rate permitted by applicable law. Interest

shall continue to accrue daily on any outstanding balance until Defendant is current on all payments then due under this Consent Decree, and shall be paid at the same time that the payments, fees, or costs owed are paid to CSPA. Interest on late payments shall be paid by check payable to: Rose Foundation for Communities and the Environment, and such funds shall be used for the sole purpose of funding environmentally beneficial projects, as described in Paragraph 32. Payment shall be sent via overnight mail to Rose Foundation for Communities and the Environment 201 4th Street, Suite 102, Oakland, CA 94607.

## IV. DISPUTE RESOLUTION

36. This Court shall retain jurisdiction over this matter for the Term for the purposes of enforcing its terms and conditions, and adjudicating all disputes among the Parties that may arise under the provisions of this Consent Decree. The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

37. Meet and Confer. Either Party to this Consent Decree may invoke the dispute resolution procedures of this Section IV by notifying the other Party in writing of the matter(s) in dispute and of the disputing Party's proposal for resolution. The Parties shall then meet and confer in good faith (either telephonically or in person) within ten (10) business days of the date of the notice in an attempt to fully resolve the dispute no later than thirty (30) days of the meet and confer.

38. Settlement Conference. If the Parties cannot resolve the dispute within thirty (30) days of the meet and confer described in Paragraph 37, the Parties agree that the dispute may be submitted for formal resolution by filing a motion before the United States District Court for the Northern District of California. The Parties agree to request an expedited hearing schedule on the motion.

39. In resolving any dispute arising from this Consent Decree before the Court, the prevailing Party shall be entitled to seek fees and costs incurred pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, 33 U.S.C. §

1365(d), and applicable case law interpreting such provisions, or as otherwise provided for by statute and/or case law.

## V. MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

40. Plaintiff's Waiver and Release of Defendant. In consideration of the above, upon the Effective Date of this Consent Decree, Plaintiff, on its own behalf and on behalf of its officers and directors, releases Defendants, and their officers, directors, managers, employees, members, parents, subsidiaries, divisions, affiliates, successors or assigns, agents, attorneys and other representatives, from and waives all claims that were raised in the 60-Day Notice Letter and/or the Complaint up to and including the Termination Date of this Consent Decree. Upon entry of this Consent Decree by the Court, Plaintiff shall dismiss Republic Services, Inc. with prejudice.

41. Defendant's Waiver and Release of Plaintiff. In consideration of the above, upon the Effective Date of this Consent Decree, Defendant, on its own behalf and on behalf of its officers, directors, employees, parents, subsidiaries, affiliates and each of their successors or assigns, release Plaintiff, its officers and directors, from and waives all claims related to the 60-Day Notice Letter and/or the Complaint up to and including the Termination Date of this Consent Decree.

42. Nothing in this Consent Decree limits or otherwise affects Plaintiff's rights to address or take any position that it deems necessary or appropriate in an informal or formal proceeding before the State Board, Regional Board, EPA, or any other judicial or administrative body on any matter relating to Defendant's compliance at the Facility with the General Permit or the Clean Water Act occurring or arising after the Effective Date; provided, however, that the foregoing waivers and releases shall apply to bar the assertion by any Party during the Term of any claims for damages, civil penalties or other monetary or injunctive relief, except as expressly provided for in this Consent Decree.

## VI. MISCELLANEOUS PROVISIONS

43. No Admission of Liability. The Parties enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation. Neither the Consent Decree nor any payment pursuant to the Consent Decree shall constitute or be construed as a finding, adjudication, or acknowledgement of any fact, law or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. Defendant maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

44. Counterparts. This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document. Telecopy and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

45. Authority. The undersigned representatives for Plaintiff and Defendant each certify that s/he is fully authorized by the Party whom s/he represents to enter into this Consent Decree. A Party's signature to this Consent Decree transmitted by facsimile or electronic mail shall be deemed binding.

46. Construction. The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Permit, the Clean Water Act, or specifically herein. The captions and paragraph headings used in this Consent Decree are for reference only and shall not affect the construction of this Consent Decree.

47. Full Settlement. This Consent Decree constitutes a full and final settlement of this matter.

48. Integration Clause. This is an integrated Consent Decree. This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

49. Severability. In the event that any provision, paragraph, section, or sentence of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

50. Choice of Law. The laws of the United States shall govern this Consent Decree.

51. Diligence. Defendant shall diligently file and pursue all required permit applications for any required BMPs and shall diligently procure contractors, labor, and materials needed to complete all BMPs by the required deadlines.

52. Effect of Consent Decree. Compliance with this Consent Decree does not mean that Defendant is complying with the General Permit, the Clean Water Act, or any other law, rule, or regulation.

53. Negotiated Settlement. The Settling Parties have negotiated this Consent Decree, and agree that it shall not be construed against the Party preparing it, but shall be construed as if the Settling Parties jointly prepared this Consent Decree, and any uncertainty and ambiguity shall not be interpreted against any one Party.

54. Modification of the Consent Decree. This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Parties and approved by the Court. Any request to modify any provision of the Consent Decree, including but not limited to any deadline(s) set forth herein, must be made in writing at least fourteen (14) days before the existing deadline(s) applicable to the provision(s) proposed to be modified.

55. Assignment. Subject only to the express restrictions contained in this Consent Decree, all of the rights, duties and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the Parties, and their successors and assigns. Defendant shall notify Plaintiff within ten (10) days of any assignment.

56. Force Majeure. Neither of the Parties shall be considered to be in default in the performance of any of their respective obligations under this Consent Decree

when performance becomes impossible due to a Force Majeure event. A Force Majeure event is any circumstance beyond a Settling Party's control, including without limitation, any act of God, war, fire, earthquake, flood, windstorm, pandemic, public health crisis, or natural catastrophe; criminal acts; civil disturbance, vandalism, sabotage, or terrorism; restraint by court order or public authority or agency; or action or non-action by, unforeseen subsurface conditions (including but not limited to unmapped utilities, structural obstructions, or adverse geotechnical conditions, which delay excavation or installation of the treatment system), or inability to obtain the necessary authorizations, permits or approvals from any governmental agency. A Force Majeure event shall not include normal inclement weather, economic hardship, inability to pay, or employee negligence. With respect to any obligation requiring site alterations, construction, excavation, or installation of treatment systems at the Facility, the inability to obtain a landlord's consent shall not constitute a Force Majeure event unless Defendant demonstrates, by a preponderance of the evidence, that Defendant used commercially reasonable best efforts, beginning promptly after the Effective Date, to obtain such consent. Any Party seeking to rely upon this Paragraph to excuse or postpone performance shall have the burden of establishing that it could not reasonably have been expected to avoid the Force Majeure event and which by exercise of due diligence has been unable to overcome the failure of performance. The Parties shall exercise due diligence to resolve and remove any Force Majeure event.

57. Correspondence. All notices required herein or any other correspondence pertaining to this Consent Decree shall be, the extent feasible, sent via electronic mail transmission to the e-mail address listed below, or if electronic mail is not feasible, then by certified U.S. mail with return receipt, or by hand delivery to the following addresses:

| If to Plaintiff: | If to Defendant: |
| --- | --- |
| California Sportfishing Protection Alliance<br>Chris Shutes, Executive Director<br>1608 Francisco Street<br>Berkeley, CA 94703,<br>Email: cshutes@calsport.org<br>Phone: (510) 421-2405 | Joshua Mills<br>Area Director of Operations Support<br>BFI Waste Systems N.A. (Republic)<br>2125 Oak Grove Road—Suite 110<br>Walnut Creek, CA 94598<br>Email: jmills3@republicservices.com<br>Phone: (510) 262-7576, and<br><br>Nick Colley<br>Team Environmental Manager<br>BFI Waste Systems N.A. (Republic)<br>2125 Oak Grove Road—Suite 110<br>Walnut Creek, CA 94598<br>Email: ncolley@republicservices.com<br>Phone: (925) 588-5919 |
| With copies to:<br>LAW OFFICE OF WILLIAM CARLON<br>William Carlon<br>437 Post Street<br>Napa, CA 94559<br>Email: william@carlonlaw.com<br>Phone: (530) 514-4115 | With copies to:<br>LAW OFFICES OF THOMAS M. BRUEN<br>Thomas M. Bruen<br>1990 North California Blvd., Suite 800<br>Walnut Creek, CA 94596<br>Email: tbruen@tbsglaw.com<br>Phone: (925) 708-4149 |

Notifications of communications shall be deemed submitted three (3) days after the date that they are postmarked and sent by first-class mail, or immediately after acknowledgement of receipt via email by the receiving Party. Any change of address or addresses shall be communicated in the manner described above for giving notices.

58. If for any reason the Federal Agencies should object to entry of this Consent Decree or to any portion of this Consent Decree or the Court should decline to approve this Consent Decree in the form presented, the Parties shall use their best efforts to work together to modify the Consent Decree within thirty (30) days so that it is acceptable to the Federal Agencies or the Court. If the Parties are unable to

modify this Consent Decree in a mutually acceptable manner that is also acceptable to the Court, this Consent Decree shall immediately be null and void as well as inadmissible as a settlement communication under Federal Rule of Evidence 408 and California Evidence Code section 1152.

The Parties hereto enter into this Consent Decree and submit it to the Court for its approval and entry as a final judgment.

IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date first set forth below.

APPROVED AS TO CONTENT

Dated: August 10, 2026 By: ____________________

Chris Shutes
Executive Director
California Sportfishing Protection Alliance

Dated: ______________, 2026 By: ____________________

Yassar J. Brenes
Vice President
BFI Waste Systems of N. America, LLC

APPROVED AS TO FORM

Law Office of William Carlon

Dated: August 12, 2026 By: ____________________

William Carlon
Attorney for Plaintiff
California Sportfishing Protection Alliance

Law Offices of Thomas M. Bruen, P.C.

Dated: ______________, 2026

By: ________________________
Thomas M. Bruen
Attorney for Defendant
BFI Waste Systems of N. America, LLC

**IT IS SO ORDERED.**
**FINAL JUDGMENT**

Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between the Plaintiff and Defendant.

Dated: ____________________

NORTHERN DISTRICT OF CALIFORNIA

____________________________________
HONORABLE LAUREL BEELER
United States Magistrate Judge

modify this Consent Decree in a mutually acceptable manner that is also acceptable to the Court, this Consent Decree shall immediately be null and void as well as inadmissible as a settlement communication under Federal Rule of Evidence 408 and California Evidence Code section 1152.

The Parties hereto enter into this Consent Decree and submit it to the Court for its approval and entry as a final judgment.

IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date first set forth below.

APPROVED AS TO CONTENT

Dated: ______________, 2026

By: ________________________
Chris Shutes
Executive Director
California Sportfishing Protection Alliance

Dated: August 12, 2026

By: Yasser Brenes
Yassar J. Brenes
Vice President
BFI Waste Systems of North America, LLC

APPROVED AS TO FORM

Law Office of William Carlon

Dated: ______________, 2026

By: ________________________
William Carlon
Attorney for Plaintiff
California Sportfishing Protection Alliance

Law Offices of Thomas M. Bruen, P.C.

Dated: AUGUST 12, 2026

By: Thomas M. Bruen
Thomas M. Bruen
Attorney for Defendant
BFI Waste Systems of North America, LLC

**IT IS SO ORDERED.**
**FINAL JUDGMENT**

Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between the Plaintiff and Defendant.

Dated: ____________________

NORTHERN DISTRICT OF CALIFORNIA

______________________________
HONORABLE LAUREL BEELER
United States Magistrate Judge

# EXHIBIT 1




LEGEND

- PROPERTY BOUNDARY
- DRAINAGE AREA
- SITE STORM DRAIN LINES
- MUNICIPAL STORM DRAIN LINES
- BUILDING
- EXISTING DRAIN INLET
- EXISTING DRAIN INLET AND DISCHARGE MONITORING LOCATION
- EXISTING MANHOLE

NOTES:

1. AERIAL IMAGE ADAPTED FROM GOOGLE EARTH IMAGERY DATED OCTOBER 31, 2025.
2. EXISTING STORMWATER INFRASTRUCTURE LOCATIONS AND ELEVATIONS BASED ON A FIELD SURVEY CONDUCTED BY RUGGERI–AZAR (RJA), DATED FEBRUARY 20, 2026.
3. PROPERTY BOUNDARY LOCATION IS APPROXIMATE.
4. DRAINAGE BOUNDARIES ADAPTED FROM STORMWATER POLLUTION PREVENTION PLAN (SWPPP) SITE PLAN – FIGURE 2, PREPARED BY GEO-LOGIC ASSOCIATES, DATED DECEMBER 2023.

☒ DRAFT
☐ RELEASED FOR BID
☐ APPROVED FOR CONSTRUCTION
☐ CLIENT APPROVAL BY: ______
☐ OTHER: ______

PREPARED FOR:
FREMONT HAULING FACILITY

# EXISTING STORMWATER INFRASTRUCTURE

FREMONT HAULING FACILITY
FREMONT, ALAMEDA COUNTY, CA

| No. | DATE | REVISION DESCRIPTION | BY |
|---|---|---|---|
| | | | |

Weaver Consultants Group

WEAVER CONSULTANTS GROUP
1316 BOND STREET, SUITE 108
NAPERVILLE, ILLINOIS 60563
(630) 717-4848
www.wcgrp.com

REUSE OF DOCUMENTS
This document, and the designs incorporated herein, as an instrument of professional service, is the property of Weaver Consultants Group, and is not to be used in whole or in part, without the written authorization of Weaver Consultants Group.

| | |
|---|---|
| DRAWN BY: | EPG |
| REVIEWED BY: | JED |
| DATE: | 04/10/2026 |
| FILE: | 0120-915-DWG |
| CAD: | FHF_STORMWATER_26_EXISTING.dwg |

SHEET 1

N:\Projects\0120 - Republic Services\915 - Fremont Hauling Facility\Drawings\FHF_STORMWATER_26_EXISTING.dwg,WCGv1965,jdrewnowski,April 10, 2026

COPYRIGHT © 2026 WEAVER CONSULTANTS GROUP. ALL RIGHTS RESERVED.


N
1" = 30'
0 15' 30' 60'
LEGEND
PROPERTY BOUNDARY
SITE STORM DRAIN LINES
MUNICIPAL STORM DRAIN LINES
BUILDING
EXISTING DRAIN INLET
EXISTING DRAIN INLET AND PREVIOUS DISCHARGE MONITORING LOCATION
EXISTING MANHOLE
PROPOSED STORM DRAIN LINE
PROPOSED STORM TREATMENT STRUCTURE
PROPOSED MANHOLE JUNCTION/ NEW DISCHARGE MONITORING LOCATION
NOTES:
1. AERIAL IMAGE ADAPTED FROM GOOGLE EARTH IMAGERY DATED OCTOBER 31, 2025.
2. EXISTING STORMWATER INFRASTRUCTURE LOCATIONS AND ELEVATIONS BASED ON A FIELD SURVEY CONDUCTED BY RUGGERI–AZAR (RJA), DATED FEBRUARY 20, 2026.
3. PROPERTY BOUNDARY LOCATION IS APPROXIMATE.
DMH 14.69' 36" NW SW INV:7.99'
DMH 20 14.76' 36" NW SW INV:8.06' 12" SE INV:8.76'
8' X 12' MEDIA FILTRATION UNIT 4/3
HIGH FLOW BYPASS MANHOLE 2/3
MP-1
HYDRODYNAMIC SEPARATOR 1/3
DI-02 13.59' 12" NW SE INV:9.19'
DI-03 13.53' 8" SE INV:9.93'
MP-3
HYDRODYNAMIC SEPARATOR 1/3
MP-4
DI-04 13.58' 8" SW SE INV:9.71'
HIGH FLOW BYPASS MANHOLE 2/3
DI-10 13.27' 8" SW SE INV:9.07'
DI-01 14.54' 12" NW NE INV:9.79'
PAINT/TIRE SHOP
DI-11 13.88' 8" SW NE INV:10.28'
6' X 8' MEDIA FILTRATION UNIT 3/3
PROPOSED DRIVE OVER SPILL CONTAINMENT BERM 2/4
DI-09 13.43' 8" NE SW INV:9.33'
MP-2
DI-12 13.38' 8" NE INV:10.73'
8' X 12' MEDIA FILTRATION UNIT 4/3
DI-05 13.59' 8" NW SE INV:10.24'
HYDRODYNAMIC SEPARATOR 1/3
OFFICE
EXISTING TRUCK WASH (DRAINS TO SANITARY SEWER)
MAINTANCE SHOP
DI-08 13.59' 8" NW INV:10.69'
CB 11.78' 18" NW INV:8.08'
DI-06 13.61' 8" NW SE INV:10.31'
DMH 12.31' 48" NE SW INV:6.61'
DI-07 13.78' 8" NW INV:10.78'
COPYRIGHT © 2026 WEAVER CONSULTANTS GROUP. ALL RIGHTS RESERVED.
DRAFT
RELEASED FOR BID
APPROVED FOR CONSTRUCTION
CLIENT APPROVAL BY:
OTHER:
PREPARED FOR:
FREMONT HAULING FACILITY
CONCEPTUAL STORMWATER TREATMENT SYSTEM
FREMONT HAULING FACILITY FREMONT, ALAMEDA COUNTY, CA
No. DATE REVISION DESCRIPTION BY
Weaver Consultants Group
WEAVER CONSULTANTS GROUP
1316 BOND STREET, SUITE 108
NAPERVILLE, ILLINOIS 60563
(630) 717-4848
www.wcgrp.com
REUSE OF DOCUMENTS
This document, and the designs incorporated herein, as an instrument of professional service, is the property of Weaver Consultants Group, and is not to be used in whole or in part, without the written authorization of Weaver Consultants Group.
DRAWN BY: EPG
REVIEWED BY: JED
DATE: 04/07/2026
FILE: 0120-915-DWG
CAD: FHF_STORMWATER_26_CONCEPTUAL.dwg
SHEET 2




## CDS2015-4-C DESIGN NOTES

CDS2015-4-C STANDARD CONFIGURATION IS SHOWN.

FOR NJDEP PROJECTS, PLEASE CONTACT YOUR LOCAL CONTECH REPRESENTATIVE FOR APPROVED CONFIGURATIONS.



FRAME AND COVER
(DIAMETER VARIES)
NOT TO SCALE

### SITE SPECIFIC DATA REQUIREMENTS

| | | | |
|---|---|---|---|
| STRUCTURE ID | | | |
| WATER QUALITY FLOW RATE (CFS OR L/s) | | | * |
| PEAK FLOW RATE (CFS OR L/s) | | | * |
| RETURN PERIOD OF PEAK FLOW (YRS) | | | * |
| SCREEN APERTURE (2400 OR 4700) | | | * |
| PIPE DATA: | I.E. | MATERIAL | DIAMETER |
| INLET PIPE 1 | * | * | * |
| INLET PIPE 2 | * | * | * |
| OUTLET PIPE | * | * | * |
| RIM ELEVATION | | | * |
| ANTI-FLOTATION BALLAST | | WIDTH | HEIGHT |
| | | * | * |
| NOTES/SPECIAL REQUIREMENTS: | | | |

* PER ENGINEER OF RECORD

GENERAL NOTES
1. CONTECH TO PROVIDE ALL MATERIALS UNLESS NOTED OTHERWISE.
2. FOR SITE SPECIFIC DRAWINGS WITH DETAILED STRUCTURE DIMENSIONS AND WEIGHT, PLEASE CONTACT YOUR CONTECH ENGINEERED SOLUTIONS LLC REPRESENTATIVE. www.ContechES.com
3. CDS WATER QUALITY STRUCTURE SHALL BE IN ACCORDANCE WITH ALL DESIGN DATA AND INFORMATION CONTAINED IN THIS DRAWING. CONTRACTOR TO CONFIRM STRUCTURE MEETS REQUIREMENTS OF PROJECT.
4. STRUCTURE SHALL MEET AASHTO HS20 LOAD RATING, ASSUMING EARTH COVER OF 0' - 2', AND GROUNDWATER ELEVATION AT, OR BELOW, THE OUTLET PIPE INVERT ELEVATION. ENGINEER OF RECORD TO CONFIRM ACTUAL GROUNDWATER ELEVATION. CASTINGS SHALL MEET AASHTO M306 AND BE CAST WITH THE CONTECH LOGO..
5. IF REQUIRED, PVC HYDRAULIC SHEAR PLATE IS PLACED ON SHELF AT BOTTOM OF SCREEN CYLINDER. REMOVE AND REPLACE AS NECESSARY DURING MAINTENANCE CLEANING.
6. CDS STRUCTURE SHALL BE PRECAST CONCRETE CONFORMING TO ASTM C-478 AND AASHTO LOAD FACTOR DESIGN METHOD.

INSTALLATION NOTES
A. ANY SUB-BASE, BACKFILL DEPTH, AND/OR ANTI-FLOTATION PROVISIONS ARE SITE-SPECIFIC DESIGN CONSIDERATIONS AND SHALL BE SPECIFIED BY ENGINEER OF RECORD.
B. CONTRACTOR TO PROVIDE EQUIPMENT WITH SUFFICIENT LIFTING AND REACH CAPACITY TO LIFT AND SET THE CDS MANHOLE STRUCTURE.
C. CONTRACTOR TO INSTALL JOINT SEALANT BETWEEN ALL STRUCTURE SECTIONS AND ASSEMBLE STRUCTURE.
D. CONTRACTOR TO PROVIDE, INSTALL, AND GROUT INLET AND OUTLET PIPE(S). MATCH PIPE INVERTS WITH ELEVATIONS SHOWN. ALL PIPE CENTERLINES TO MATCH PIPE OPENING CENTERLINES.
E. CONTRACTOR TO TAKE APPROPRIATE MEASURES TO ASSURE UNIT IS WATER TIGHT, HOLDING WATER TO FLOWLINE INVERT MINIMUM. IT IS SUGGESTED THAT ALL JOINTS BELOW PIPE INVERTS ARE GROUTED.

CONTECH ENGINEERED SOLUTIONS LLC
www.contechES.com
9025 Centre Pointe Dr., Suite 400, West Chester, OH 45069
800-338-1122 513-645-7000 513-645-7993 FAX

CDS2015-4-C
ONLINE CDS
STANDARD DETAIL

## 1/3 HYDRODYNAMIC SEPARATOR
NOT TO SCALE




StormGate™

## STORMGATE DESIGN NOTES

THE STORMGATE IS A WEIR STYLE DIVERSION STRUCTURE. A 60" [1524] Ø MANHOLE CONFIGURATION IS SHOWN. THE UNIT IS DESIGNED SUCH THAT THE TREATMENT FLOW IS DIVERTED TO THE OFFLINE WATER QUALITY DEVICE. THE HIGH FLOWS ARE BYPASSED OVER THE WEIR DIRECTLY TO THE DOWNSTREAM CONVEYANCE. THE STORMGATE TYPICALLY HAS ONE INLET, A LOW FLOW OUTLET FOR TREATMENT FLOW, AND A HIGH FLOW BYPASS OUTLET. THE STORMGATE INCORPORATES A FIELD-ADJUSTABLE ALUMINUM WEIR PLATE WHICH ALLOWS FOR 6" [152] OF WEIR HEIGHT ADJUSTMENT AFTER INSTALLATION. THE CAPACITY OF THE STORMGATE IS A FUNCTION OF THE AVAILABLE HEIGHT ABOVE THE WEIR (HEAD) AND UNIT GEOMETRY. PLEASE CONTACT YOUR LOCAL CONTECH DESIGN ENGINEER FOR SIZING ASSISTANCE.



FRAME AND COVER
(DIAMETER VARIES)
NOT TO SCALE

### SITE SPECIFIC DATA REQUIREMENTS

| | | | | |
|---|---|---|---|---|
| STRUCTURE ID | | | | |
| WATER QUALITY (WQ) FLOW RATE (cfs [L/s]) | | | | |
| PEAK FLOW RATE (cfs [L/s]) | | | | |
| RIM ELEVATION | | | | |
| PIPE DATA: | INVERT | ORIENTATION | MATERIAL | DIAMETER |
| INLET PIPE | | | | |
| WQ FLOW OUTLET PIPE | | | | |
| PEAK FLOW OUTLET PIPE | | | | |
| ORIFICE TYPE (PIPE, PLATE) | | | | |
| ORIFICE DIAMETER (in. [mm]) | | | | |
| WEIR CREST ELEVATION | | | | |
| WEIR WALL ELEVATION | | | | |
| HEAD OVER WEIR, H (ft. [mm]) | | | | |
| WSE AT PEAK FLOW RATE | | | | |
| WEIR ORIENTATION | | | | |
| FLOOR ELEVATION | | | | |
| NOTES / SPECIAL REQUIREMENTS: | | | | |

GENERAL NOTES
1. CONTECH TO PROVIDE ALL MATERIALS UNLESS NOTED OTHERWISE.
2. FOR SITE SPECIFIC DRAWINGS WITH DETAILED STRUCTURE DIMENSIONS AND WEIGHTS, PLEASE CONTACT YOUR CONTECH ENGINEERED SOLUTIONS LLC REPRESENTATIVE. www.ContechES.com
3. STORMGATE WATER QUALITY STRUCTURE SHALL BE IN ACCORDANCE WITH ALL DESIGN DATA AND INFORMATION CONTAINED IN THIS DRAWING. CONTRACTOR TO CONFIRM STRUCTURE MEETS THE REQUIREMENTS OF THE PROJECT.
4. STORMGATE STRUCTURE SHALL MEET AASHTO HS-20 LOAD RATING, ASSUMING EARTH COVER OF 0' - 2' [610] AND GROUNDWATER ELEVATION AT, OR BELOW, THE OUTLET PIPE INVERT ELEVATION. ENGINEER OF RECORD TO CONFIRM ACTUAL GROUNDWATER ELEVATION. CASTINGS SHALL MEET AASHTO M306 AND BE CAST WITH THE CONTECH LOGO.
5. STORMGATE STRUCTURE SHALL BE PRECAST CONCRETE CONFORMING TO ASTM C478 AND AASHTO LOAD FACTOR DESIGN METHOD.
6. WEIR FRAME AND ADJUSTABLE WEIR PLATE SHALL BE FABRICATED OF ALUMINUM ALLOY ASTM B209, T-5052, T-6061, PROVIDED AND INSTALLED BY CONTECH.
7. ALTERNATE UNITS ARE SHOWN IN [mm].

INSTALLATION NOTES
A. ANY SUB-BASE, BACKFILL DEPTH, AND/OR ANTI-FLOTATION PROVISIONS ARE SITE-SPECIFIC DESIGN CONSIDERATIONS AND SHALL BE SPECIFIED BY ENGINEER OF RECORD.
B. CONTRACTOR TO PROVIDE EQUIPMENT WITH SUFFICIENT LIFTING AND REACH CAPACITY TO LIFT AND SET THE STORMGATE STRUCTURE.
C. CONTRACTOR TO INSTALL JOINT SEALANT BETWEEN ALL STRUCTURE SECTIONS AND ASSEMBLE STRUCTURE.
D. CONTRACTOR TO PROVIDE, INSTALL, AND GROUT INLET AND OUTLET PIPE(S). MATCH PIPE INVERTS WITH ELEVATIONS SHOWN ON SITE SPECIFIC DRAWINGS. ALL PIPE CENTERLINES TO MATCH PIPE OPENING CENTERLINES.
E. CONTRACTOR TO TAKE APPROPRIATE MEASURES TO ASSURE UNIT IS WATER TIGHT, HOLDING WATER TO FLOWLINE INVERT MINIMUM.
F. CONTRACTOR TO ADJUST STORMGATE WEIR TO DESIGN ELEVATION SPECIFIED IN DRAWING. DO NOT EXCEED 5.0 FT-LBS TORQUE WHEN TIGHTENING SCREWS ON WEIR FRAME. SEAL WEIR TO FRAME WITH SIKAFLEX 1A SEALANT AFTER FINAL ADJUSTMENT.

CONTECH ENGINEERED SOLUTIONS LLC
www.ContechES.com
9025 Centre Pointe Dr., Suite 400, West Chester, OH 45069
800-338-1122 513-645-7000 513-645-7993 FAX

SGMH60
STORMGATE MANHOLE
STANDARD DETAIL

## 2/3 HIGH FLOW BYPASS MANHOLE
NOT TO SCALE




StormFilter®

## STORMFILTER DESIGN NOTES

- STORMFILTER TREATMENT CAPACITY VARIES BY CARTRIDGE COUNT AND LOCALLY APPROVED SURFACE AREA SPECIFIC FLOW RATE. PEAK CONVEYANCE CAPACITY TO BE DETERMINED BY ENGINEER OF RECORD
- A 6' x 8' [1829 x 2438] PEAK DIVERSION STYLE STORMFILTER IS SHOWN WITH THE MAXIMUM NUMBER OF CARTRIDGES (8) AND IS AVAILABLE IN A LEFT INLET (AS SHOWN) OR A RIGHT INLET CONFIGURATION
- ALL PARTS AND INTERNAL ASSEMBLY PROVIDED BY CONTECH UNLESS NOTED OTHERWISE

| CARTRIDGE SIZE (in. [mm]) | 27 [686] | | | 18 [457] | | | LOW DROP | | |
|---|---|---|---|---|---|---|---|---|---|
| RECOMMENDED HYDRAULIC DROP (H) (ft. [mm]) | 3.05 [930] | | | 2.3 [701] | | | 1.8 [549] | | |
| HEIGHT OF WEIR (W) (ft. [mm]) | 3.00 [914] | | | 2.25 [686] | | | 1.75 [533] | | |
| SPECIFIC FLOW RATE (gpm/sf [L/s/m2]) | 2 [1.36] | 1.67* [1.13]* | 1 [0.68] | 2 [1.36] | 1.67* [1.13]* | 1 [0.68] | 2 [1.36] | 1.67* [1.13]* | 1 [0.68] |
| CARTRIDGE FLOW RATE (gpm [L/s]) | 22.5 [1.42] | 18.79 [1.19] | 11.25 [0.71] | 15 [0.95] | 12.53 [0.79] | 7.5 [0.47] | 10 [0.63] | 8.35 [0.53] | 5 [0.32] |

* 1.67 gpm/sf [1.13 L/s/m2] SPECIFIC FLOW RATE IS APPROVED WITH PHOSPHOSORB® (PSORB) MEDIA ONLY



FRAME AND GRATE
(24" SQUARE)
(NOT TO SCALE)

FRAME AND COVER
(24" ROUND)
(NOT TO SCALE)

ACCESS HATCH
(48" SQUARE)
(NOT TO SCALE)

### SITE SPECIFIC DATA REQUIREMENTS

| | | | |
|---|---|---|---|
| STRUCTURE ID | | | |
| WATER QUALITY FLOW RATE (cfs [L/s]) | | | |
| PEAK FLOW RATE (cfs [L/s]) | | | |
| RETURN PERIOD OF PEAK FLOW (yrs) | | | |
| CARTRIDGE FLOW RATE | | | |
| CARTRIDGE SIZE (27, 18, LOW DROP (LD)) | | | |
| MEDIA TYPE (PERLITE, ZPG, PSORB) | | | |
| NUMBER OF CARTRIDGES REQUIRED | | | |
| FILTER BAY RIM ELEVATION | | | |
| PIPE DATA: | INVERT | MATERIAL | DIAMETER |
| INLET PIPE 1 | | | |
| INLET PIPE 2 | | | |
| OUTLET PIPE | | | |
| NOTES/SPECIAL REQUIREMENTS: | | | |

### RIM TO SYSTEM INVERT

| CARTRIDGE SIZE | MIN. HEIGHT | MAX. HEIGHT |
|---|---|---|
| LOW DROP / 18" | 3'-6" | 4'-10" |
| 27" | 4'-2" | 4'-10" |

PERFORMANCE SPECIFICATION
FILTER CARTRIDGES SHALL BE MEDIA-FILLED, PASSIVE, SIPHON ACTUATED, RADIAL FLOW, AND SELF CLEANING. RADIAL MEDIA DEPTH SHALL BE 7-INCHES. FILTER MEDIA CONTACT TIME SHALL BE AT LEAST 38 SECONDS. SPECIFIC FLOW RATE SHALL BE 2 GPM/SF (MAXIMUM). SPECIFIC FLOW RATE IS THE MEASURE OF THE FLOW (GPM) DIVIDED BY THE MEDIA SURFACE CONTACT AREA (SF). MEDIA VOLUMETRIC FLOW RATE SHALL BE 6 GPM/CF OF MEDIA (MAXIMUM).

GENERAL NOTES
1. CONTECH TO PROVIDE ALL MATERIALS UNLESS NOTED OTHERWISE.
2. DIMENSIONS MARKED WITH ( ) ARE REFERENCE DIMENSIONS. ACTUAL DIMENSIONS MAY VARY.
3. FOR FABRICATION DRAWINGS WITH DETAILED STRUCTURE DIMENSIONS AND WEIGHTS, PLEASE CONTACT YOUR CONTECH REPRESENTATIVE. www.ContechES.com
4. STORMFILTER WATER QUALITY STRUCTURE SHALL BE IN ACCORDANCE WITH ALL DESIGN DATA AND INFORMATION CONTAINED IN THIS DRAWING. CONTRACTOR TO CONFIRM STRUCTURE MEETS REQUIREMENTS OF PROJECT.
5. STRUCTURE SHALL MEET AASHTO HS-20 LOAD RATING, ASSUMING EARTH COVER OF 0'-0", AND GROUNDWATER ELEVATION AT, OR BELOW, THE OUTLET PIPE INVERT ELEVATION. ENGINEER OF RECORD TO CONFIRM ACTUAL GROUNDWATER ELEVATION. CASTINGS SHALL MEET AASHTO M306 AND BE CAST WITH THE CONTECH LOGO.

INSTALLATION NOTES
A. ANY SUB-BASE, BACKFILL DEPTH, AND/OR ANTI-FLOTATION PROVISIONS ARE SITE-SPECIFIC DESIGN CONSIDERATIONS AND SHALL BE SPECIFIED BY ENGINEER OF RECORD.
B. CONTRACTOR TO PROVIDE EQUIPMENT WITH SUFFICIENT LIFTING AND REACH CAPACITY TO LIFT AND SET THE STORMFILTER STRUCTURE.
C. CONTRACTOR TO ASSEMBLE STRUCTURE.
D. CONTRACTOR TO PROVIDE, INSTALL, AND GROUT PIPES. MATCH OUTLET PIPE INVERT WITH OUTLET BAY FLOOR.
E. CONTRACTOR TO TAKE APPROPRIATE MEASURES TO PROTECT CARTRIDGES FROM CONSTRUCTION-RELATED EROSION RUNOFF.
F. CONTRACTOR TO REMOVE THE TRANSFER HOLE COVER WHEN THE SYSTEM IS BROUGHT ONLINE.

CONTECH ENGINEERED SOLUTIONS LLC
www.ContechES.com
9100 Centre Pointe Dr., Suite 400, West Chester, OH 45069
800-338-1122 513-645-7000 513-645-7993 FAX

SFPD0608-S
6' x 8' PEAK DIVERSION STORMFILTER
SHALLOW STANDARD DETAIL

## 3/3 6' x 8' MEDIA FILTRATION UNIT
NOT TO SCALE




## STORMFILTER DESIGN NOTES

STORMFILTER TREATMENT CAPACITY IS A FUNCTION OF THE CARTRIDGE SELECTION AND THE NUMBER OF CARTRIDGES. THE STANDARD VAULT STYLE IS SHOWN WITH THE MAXIMUM NUMBER OF CARTRIDGES (28). VAULT STYLE OPTIONS INCLUDE INLET BAY (19), INLET BAY/OUTLET BAY (14), OUTLET BAY (24), FULL HEIGHT BAFFLE WALL (20). STORMFILTER 8' x 12' PEAK FLOW CAPACITY EXCEEDS 1.8 CFS. IF THE SITE CONDITIONS EXCEED 1.8 CFS AN UPSTREAM BYPASS STRUCTURE IS REQUIRED.

CARTRIDGE SELECTION

| CARTRIDGE HEIGHT | 27" | | | 18" | | | LOW DROP | | |
|---|---|---|---|---|---|---|---|---|---|
| RECOMMENDED HYDRAULIC DROP (H) | 3.05' | | | 2.3' | | | 1.8' | | |
| SPECIFIC FLOW RATE (gpm/sf) | 2 gpm/sf | 1.67* gpm/sf | 1 gpm/sf | 2 gpm/sf | 1.67* gpm/sf | 1 gpm/sf | 2 gpm/sf | 1.67* gpm/sf | 1 gpm/sf |
| CARTRIDGE FLOW RATE (gpm) | 22.5 | 18.79 | 11.25 | 15 | 12.53 | 7.5 | 10 | 8.35 | 5 |

* 1.67 gpm/sf SPECIFIC FLOW RATE IS APPROVED WITH PHOSPHOSORB® (PSORB) MEDIA ONLY



FRAME AND COVER
(DIAMETER VARIES)
NOT TO SCALE

### SITE SPECIFIC DATA REQUIREMENTS

| | | | |
|---|---|---|---|
| STRUCTURE ID | | | * |
| WATER QUALITY FLOW RATE (cfs) | | | * |
| PEAK FLOW RATE (cfs) | | | * |
| RETURN PERIOD OF PEAK FLOW (yrs) | | | * |
| CARTRIDGE HEIGHT (27", 18", LOW DROP(LD)) | | | * |
| NUMBER OF CARTRIDGES REQUIRED | | | * |
| CARTRIDGE FLOW RATE | | | * |
| MEDIA TYPE (PERLITE, ZPG, PSORB) | | | * |
| PIPE DATA: | I.E. | MATERIAL | DIAMETER |
| INLET PIPE #1 | * | * | * |
| INLET PIPE #2 | * | * | * |
| OUTLET PIPE | * | * | * |
| UPSTREAM RIM ELEVATION | | | * |
| DOWNSTREAM RIM ELEVATION | | | * |
| ANTI-FLOTATION BALLAST | | WIDTH | HEIGHT |
| | | * | * |
| NOTES/SPECIAL REQUIREMENTS: | | | |

* PER ENGINEER OF RECORD

GENERAL NOTES
1. CONTECH TO PROVIDE ALL MATERIALS UNLESS NOTED OTHERWISE.
2. DIMENSIONS MARKED WITH ( ) ARE REFERENCE DIMENSIONS. ACTUAL DIMENSIONS MAY VARY.
3. FOR SITE SPECIFIC DRAWINGS WITH DETAILED VAULT DIMENSIONS AND WEIGHTS, PLEASE CONTACT YOUR CONTECH ENGINEERED SOLUTIONS LLC REPRESENTATIVE. www.ContechES.com
4. STORMFILTER WATER QUALITY STRUCTURE SHALL BE IN ACCORDANCE WITH ALL DESIGN DATA AND INFORMATION CONTAINED IN THIS DRAWING.
5. STRUCTURE SHALL MEET AASHTO HS20 LOAD RATING, ASSUMING EARTH COVER OF 0' - 5' AND GROUNDWATER ELEVATION AT, OR BELOW, THE OUTLET PIPE INVERT ELEVATION. ENGINEER OF RECORD TO CONFIRM ACTUAL GROUNDWATER ELEVATION. CASTINGS SHALL MEET AASHTO M306 AND BE CAST WITH THE CONTECH LOGO.
6. FILTER CARTRIDGES SHALL BE MEDIA-FILLED, PASSIVE, SIPHON ACTUATED, RADIAL FLOW, AND SELF CLEANING. RADIAL MEDIA DEPTH SHALL BE 7-INCHES. FILTER MEDIA CONTACT TIME SHALL BE AT LEAST 38 SECONDS.
7. SPECIFIC FLOW RATE IS EQUAL TO THE FILTER TREATMENT CAPACITY (gpm) DIVIDED BY THE FILTER CONTACT SURFACE AREA (sq ft).
8. STORMFILTER STRUCTURE SHALL BE PRECAST CONCRETE CONFORMING TO ASTM C-857 AND AASHTO LOAD FACTOR DESIGN METHOD.

INSTALLATION NOTES
A. ANY SUB-BASE, BACKFILL DEPTH, AND/OR ANTI-FLOTATION PROVISIONS ARE SITE-SPECIFIC DESIGN CONSIDERATIONS AND SHALL BE SPECIFIED BY ENGINEER OF RECORD.
B. CONTRACTOR TO PROVIDE EQUIPMENT WITH SUFFICIENT LIFTING AND REACH CAPACITY TO LIFT AND SET THE STORMFILTER VAULT (LIFTING CLUTCHES PROVIDED).
C. CONTRACTOR TO INSTALL JOINT SEALANT BETWEEN ALL VAULT SECTIONS AND ASSEMBLE VAULT.
D. CONTRACTOR TO PROVIDE, INSTALL, AND GROUT PIPES. MATCH OUTLET PIPE INVERT WITH OUTLET BAY FLOOR.
E. CONTRACTOR TO TAKE APPROPRIATE MEASURES TO PROTECT CARTRIDGES FROM CONSTRUCTION-RELATED EROSION RUNOFF.

CONTECH ENGINEERED SOLUTIONS LLC
www.contechES.com
9100 Centre Pointe Dr., Suite 400, West Chester, OH 45069
800-338-1122 513-645-7000 513-645-7993 FAX

SF0812
STORMFILTER
STANDARD DETAIL

## 4/3 8' x 12' MEDIA FILTRATION UNIT
NOT TO SCALE

- [x] DRAFT
- [ ] RELEASED FOR BID
- [ ] APPROVED FOR CONSTRUCTION
- [ ] CLIENT APPROVAL BY: ______
- [ ] OTHER: ______

PREPARED FOR:
FREMONT HAULING FACILITY

# STORMWATER TREATMENT SYSTEM DETAILS & SPECIFICATIONS - SHEET 1

FREMONT HAULING FACILITY
FREMONT, ALAMEDA COUNTY, CA

| No. | DATE | REVISION DESCRIPTION | BY |
|---|---|---|---|

Weaver Consultants Group

WEAVER CONSULTANTS GROUP
1316 BOND STREET, SUITE 108
NAPERVILLE, ILLINOIS 60563
(630) 717-4848
www.wcgrp.com

REUSE OF DOCUMENTS
This document, and the designs incorporated herein, as an instrument of professional service, is the property of Weaver Consultants Group, and is not to be used in whole or in part, without the written authorization of Weaver Consultants Group.

| | |
|---|---|
| DRAWN BY: | EPG |
| REVIEWED BY: | JED |
| DATE: | 04/10/2026 |
| FILE: | 0120-915-DWG |
| CAD: | FHF_STORMWATER_26_DETAILS.dwg |

SHEET 3

N:\Projects\0120 - Republic Services\915 - Fremont Hauling Facility\Drawings\FHF_STORMWATER_26_DETAILS.dwg;April 10, 2026

COPYRIGHT © 2026 WEAVER CONSULTANTS GROUP. ALL RIGHTS RESERVED.




*PREVIOUSLY INSTALLED

1/4 AREA DRAIN FILTRATION UNIT
NOT TO SCALE




2/4 DRIVE OVER SPILL CONTAINMENT BERM
NOT TO SCALE




PROCESS FLOW DIAGRAM
NOT TO SCALE

**STORMWATER TREATMENT SYSTEM – GENERAL NOTES**

1. THE STORMWATER TREATMENT SYSTEM SHOWN IS CONCEPTUAL AND PROVIDED FOR PLANNING PURPOSES ONLY. FINAL DESIGN, SIZING, AND CONFIGURATION SHALL BE VERIFIED DURING DETAILED DESIGN.
2. REFERENCES TO SPECIFIC MANUFACTURERS AND PRODUCTS ARE PROVIDED AS A BASIS OF DESIGN ONLY; EQUIVALENT SYSTEMS MAY BE USED SUBJECT TO ENGINEER APPROVAL.
PROPOSED SYSTEMS SHALL DEMONSTRATE EQUAL OR BETTER HYDRAULIC CAPACITY, TREATMENT PERFORMANCE, AND DURABILITY RELATIVE TO THE BASIS-OF-DESIGN.
3. FINAL SYSTEM SELECTION AND LAYOUT SHALL BE COORDINATED WITH THE MANUFACTURER AND VERIFIED BY THE ENGINEER PRIOR TO CONSTRUCTION.
4. MODIFICATIONS TO THE SYSTEM DESIGN MAY BE REQUIRED BASED ON REVIEW AND APPROVAL BY THE APPLICABLE LOCAL PERMITTING AUTHORITY.
5. FIELD ADJUSTMENTS TO LAYOUT AND CONFIGURATION MAY BE REQUIRED BASED ON SITE CONDITIONS, GRADING, AND UTILITY CONFLICTS.
6. INSTALLATION SHALL BE IN ACCORDANCE WITH MANUFACTURER RECOMMENDATIONS AND PROJECT SPECIFICATIONS.
7. TREATMENT SYSTEM PERFORMANCE IS DEPENDENT ON PROPER INSTALLATION AND MAINTENANCE; THIS CONCEPTUAL DESIGN DOES NOT CONSTITUTE A PERFORMANCE GUARANTEE.
8. CONCEPTUAL TREATMENT SYSTEM DESIGN BASED ON A DESIGN FLOW OF 0.2 INCHES PER HOUR, IN ACCORDANCE WITH THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, SAN FRANCISCO BAY REGION MUNICIPAL REGIONAL STORMWATER NPDES PERMIT (NPDES PERMIT NO. CAS612008, DATED MAY 11, 2022) AND THE ALAMEDA COUNTYWIDE CLEAN WATER PROGRAM, C.3 STORMWATER TECHNICAL GUIDANCE (DATED MAY 19, 2025).

☒ DRAFT
☐ RELEASED FOR BID
☐ APPROVED FOR CONSTRUCTION
☐ CLIENT APPROVAL BY: ______
☐ OTHER: ______

PREPARED FOR:
FREMONT HAULING FACILITY

**STORMWATER TREATMENT SYSTEM DETAILS & SPECIFICATIONS - SHEET 2**
FREMONT HAULING FACILITY
FREMONT, ALAMEDA COUNTY, CA

| No. | DATE | REVISION DESCRIPTION | BY |
|---|---|---|---|

Weaver Consultants Group

WEAVER CONSULTANTS GROUP
1316 BOND STREET, SUITE 108
NAPERVILLE, ILLINOIS 60563
(630) 717-4848
www.wcgrp.com

REUSE OF DOCUMENTS
This document, and the designs incorporated herein, as an instrument of professional service, is the property of Weaver Consultants Group, and is not to be used in whole or in part, without the written authorization of Weaver Consultants Group.

DRAWN BY: EPG
REVIEWED BY: JED
DATE: 04/10/2026
FILE: 0120-915-DWG
CAD: FHF_STORMWATER_26_DETAILS.dwg

SHEET 4

N:\Projects\0120 - Republic Services\915 - Fremont Hauling Facility\Drawings\FHF_STORMWATER_26_DETAILS.dwg;WCGv1905;jdrewnowski;April 13, 2026

COPYRIGHT © 2026 WEAVER CONSULTANTS GROUP. ALL RIGHTS RESERVED.